UNITED STATES AVIEX COMPANY v TRAVELERS INSURANCE
COMPANY

Docket No. 59829. Submitted October 6, 1982, at Grand Rapids.—
Decided May 5, 1983.

Plaintiff, United States Aviex Company, brought an action in the
Berrien Circuit Court against the Travelers Insurance Com-
pany for a declaratory judgment that defendant was liable to
reimburse plaintiff for costs incurred in determining and cor-
recting chemical contamination of percolating waters under-
neath plaintiff's property. Evidence at the hearing for declara-
tory judgment established that on November 25, 1978, a fire
destroyed plaintiff's chemical manufacturing facility in Niles,
Michigan. Water used in putting out the fire caused toxic
chemicals in the facility to seep into the ground, contaminating
the ground water beneath plaintiff's property. At the time of
the fire, plaintiff was insured by defendant under a policy
which required defendant to pay on behalf of plaintiff "all sums
which the insured shall become obligated to pay by reason of
liability imposed by law upon the insured * * * as damages
because of * * * property damage". Damage to "property
owned by the insured" was excluded from the policy's coverage.
Under the policy, defendant had the "right and duty to defend
any suit against the insured seeking damages * * *". In No-
vember, 1979, plaintiff was notified by the Water Quality
Division of the Department of Natural Resources that plaintiff
must conduct an investigation to determine the extent of the
contamination and correct the contamination or the DNR would
refer the matter for legal action. The parties agreed that
plaintiff promptly and correctly notified defendant of these
demands. Defendant admitted coverage (as distinct from liabil-
ity) under the insurance policy for any claim, raised by neigh-

REFERENCES FOR POINTS IN HEADNOTES
[1] 22 Am Jur 2d, Declaratory Judgment § 18.
[2] 2 Am Jur 2d, Administrative Law §§ 398-403.
    61A Am Jur 2d, Pollution Control §§ 134, 135.
[3] 43 Am Jur 2d, Insurance §§ 712, 717.
[4] 78 Am Jur 2d, Waters §§ 158, 159.
[5] 31 Am Jur 2d, Expert and Opinion Evidence § 56.

boring property owners, for damages proximately resulting from the fire but denied coverage for contamination of water located below plaintiff's property, arguing that no claim of damages had been presented against plaintiff and that the ground water beneath plaintiff's property was excluded from coverage because it was "property owned by the insured". Plaintiff proceeded to select a soil testing firm (Soil Testing Services, "STS") to perform the investigative tests demanded by the DNR and spent approximately $80,000 for the testing and firm proposals. STS installed monitoring and test wells to trace the ground water flow from plaintiff's property. At the hearing, the Director of Environmental Services for STS stated his opinion, based partly on a previous study performed by another testing firm, that the percolating water beneath plaintiff's property was flowing in a southwesterly direction at a rate of approximately 500 feet per year. According to STS's studies, chemicals from the facility had entered the ground water and been found on neighboring property. The DNR continued to press plaintiff in a series of letters to correct the contamination. In February, 1981, the DNR warned plaintiff that failure to comply with its demands would "result in escalated enforcement action being taken against the company, including a lawsuit for damages to the waters of the state". According to Michael Beck, the acting district engineer for the DNR, the demands were premised on the results of the DNR's tests, which indicated a severe ground water contamination problem beneath plaintiff's property and the presence of traces of chemicals in a neighbor's well. By the time of trial, however, the state had not filed a lawsuit. At the close of this evidence, the trial court, Chester J. Byrns, J., ruled that declaratory relief was appropriate and held that, under the insurance policy, defendant was obligated "to defend any claim or action and to pay for any damages to the extent of the policy's monetary limits determined by a tribunal of competent jurisdiction, which damages will include the costs of plaintiff imposed by such tribunal or resulting from a determination by such tribunal for correcting the chemical contamination of the percolating or ground water underneath plaintiff's premises or which has migrated beyond plaintiff's premises caused by the fire on plaintiff's premises of November 25, 1978". The court also ruled that "[t]he obligation of the defendant includes reimbursement of plaintiff for the costs and expenses of any study and testing incurred by the plaintiff to date". Defendant appealed.

The Attorney General was permitted to intervene as a plaintiff. *Held:*

1. The trial court properly allowed a declaratory judgment

action in this matter. An actual controversy sufficient to support a declaratory judgment action exists where the declaratory judgment is necessary to guide a litigant's future conduct in order to preserve his legal rights.

2. Defendant was not denied due process by the court's order to pay for expenses incurred prior to entry of the declaratory judgment. Under the water resources act, defendant was entitled to a hearing upon request prior to expending the money for testing. Defendant chose not to make any request.

3. Defendant argued that the trial court's ruling that defendant is "obligated to defend any claim or action, and to pay for any costs of [plaintiff], for correcting chemical contamination, imposed by or resulting from a determination by a tribunal of competent jurisdiction" incorrectly construed the insurance agreement to cover sums of money expended by plaintiff in response to equitable or injunctive orders, instead of covering only money paid or ordered to be paid as compensation for injury or loss. "Damages" under the insurance contract includes sums expended by plaintiff in complying with equitable and injunctive orders.

4. Defendant argued that damage to the ground water beneath plaintiff's property was excluded from the insurance policy's coverage because the water was "property owned by the insured". Percolating water is not owned by the owner of the land under which it flows and so does not fit within the policy's exclusion.

5. The opinion of the Director of Environmental Services for STS based on data not in evidence was properly admitted. Defendant had the right to inquire about that data on cross-examination.

Affirmed.

1. DECLARATORY JUDGMENTS — CONTROVERSY.

An actual controversy sufficient to support a declaratory judgment action exists where the declaratory judgment is necessary to guide a litigant's future conduct in order to preserve his legal rights.

2. ENVIRONMENT — WATER RESOURCES ACT.

The water resources act explicitly provides for disposition of a case without a hearing where the alleged polluter agrees with the terms of the proposed permit and period of time for abatement of pollution which the Water Resources Commission deems necessary (MCL 323.7; MSA 3.527).

3. INSURANCE — PROPERTY DAMAGE — WATER RESOURCES ACT —
    DAMAGES.

    A contract which obligates an insurer to "defend any suit against
    the insured seeking damages" and to pay "all sums which the
    insured shall become obligated to pay by reason of liability
    imposed by law upon the insured * * * as damages because of
    * * * property damage" obligates the insurer to defend any
    lawsuit filed against the insured under the water resources act
    and to pay any costs incurred by the insured in complying with
    any equitable or injunctive orders.

4. WATER AND WATERCOURSES — PERCOLATING WATER — REAL PROP-
    ERTY.

    Percolating water is not owned by the owner of the land under
    which it flows; the property owner's rights in the percolating
    water extend to reasonable use which does not interfere with a
    neighbor's reasonable use of the percolating water under his
    land.

5. EVIDENCE — EXPERT TESTIMONY.

    A Rule of Evidence permits expert testimony based on facts or
    data not in evidence (MRE 703).

*Tolley, Fisher & Verwys, P.C.* (by *William T. Fisher* and *Todd R. Dickinson*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Stewart H. Freeman,* Assistant Attorney General In Charge, and *Elizabeth L. Valentine,* Assistant Attorney General, for the Attorney General.

*Fisher, Troff & Fisher* (by *Theodore E. Troff*), for defendant.

Before: R. B. BURNS, P.J., and MACKENZIE and T. L. BROWN,* JJ.

T. L. BROWN, J. Defendant appeals by right from a declaratory judgment ordering defendant to reimburse plaintiff for costs incurred in determining

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and correcting chemical contamination of percolating waters underneath plaintiff's property. On appeal, defendant challenges the propriety of the declaratory relief and the decision by the trial court that defendant must reimburse the plaintiff.

Evidence at the hearing for declaratory judgment established that on November 25, 1978, a fire destroyed plaintiff's chemical manufacturing facility in Niles, Michigan. Water used in putting out the fire caused toxic chemicals in the facility to seep into the ground, contaminating the ground water beneath plaintiff's property. At the time of the fire, plaintiff was insured by defendant under a policy which required defendant to pay on behalf of plaintiff "all sums which the insured shall become obligated to pay by reason of liability imposed by law upon the insured * * * as damages because of * * * property damage". Damage to "property owned by the insured" was excluded from the policy's coverage. Under the policy, defendant had the "right and duty to defend any suit against the insured seeking damages * * *".

In November, 1979, plaintiff was notified by the Water Quality Division of the Michigan Department of Natural Resources (DNR) that plaintiff must conduct an investigation to determine the extent of the contamination and correct the contamination or the DNR would refer the matter for legal action. The parties agreed that plaintiff promptly and correctly notified defendant of these demands. Defendant admitted coverage (as distinct from liability) under the insurance policy for any claim, raised by neighboring property owners, for damages proximately resulting from the fire but denied, and continued to deny throughout the hearing, coverage for contamination of water located below plaintiff's property, arguing that no

claim of damages had been presented against plaintiff and that the ground water beneath plaintiff's property was excluded from coverage because it was "property owned by the insured".

Plaintiff proceeded to select a soil testing firm (Soil Testing Services, "STS") to peform the investigative tests demanded by the DNR and spent approximately $80,000 for the testing and firm proposals. STS installed monitoring and test wells to trace the ground water flow from plaintiff's property. At the hearing, the Director of Environmental Services for STS, Dr. Balkumar P. Shah, stated his opinion, based partly on a previous study performed by another testing firm, that the percolating water beneath plaintiff's property was flowing in a southwesterly direction at a rate of approximately 500 feet per year. According to STS's studies, chemicals from the facility had entered the ground water and been found on neighboring property. Dr. Shah stated that the costs of clean-up could exceed one million dollars.

The DNR continued to press plaintiff in a series of letters to correct the contamination. In February, 1981, the DNR warned plaintiff that failure to comply with its demands would "result in escalated enforcement action being taken against the company, including a lawsuit for damages to the waters of the state". According to Michael Beck, the acting district engineer for the DNR, the demands were premised on the results of the DNR's tests, which indicated a severe ground water contamination problem beneath plaintiff's property and the presence of traces of chemicals in a neighbor's well. By the time of trial, however, the state had not filed a lawsuit.

At the close of this evidence, the trial court ruled that declaratory relief was appropriate and

held that, under the insurance policy, defendant was obligated "to defend any claim or action and to pay for any damages to the extent of the policy's monetary limits determined by a tribunal of competent jurisdiction, which damages will include the costs of plaintiff imposed by such tribunal or resulting from a determination by such tribunal for correcting the chemical contamination of the percolating or ground water underneath plaintiff's premises or which has migrated beyond plaintiff's premises caused by the fire on plaintiff's premises of November 25, 1978". The court also ruled that "[t]he obligation of the defendant includes reimbursement of plaintiff for the costs and expenses of any study and testing incurred by the plaintiff to date".

Defendant first contends that the trial court erred in permitting plaintiff to bring an action for declaratory relief under GCR 1963, 521.1 because no actual controversy existed between plaintiff and defendant. We disagree.

The declaratory judgment rule was intended to be liberally construed to provide a broad, flexible remedy to increase access to the court. In the usual case, an actual controversy exists where a declaratory judgment is necessary to guide a litigant's future conduct in order to preserve his legal rights. A court is not precluded from reaching issues before actual injuries or losses have occurred. *Shavers v Attorney General,* 402 Mich 554, 588-589; 267 NW2d 72 (1978). In some instances, a declaratory judgment is appropriate even though future contingencies exist which will determine whether the "controversy" actually becomes real:

"The familiar type of suit in which a liability insurer seeks a declaration that it will not be liable to indemnify an insured person for any damages he may recover

against the insured is an example. The injured person may not sue or he may not obtain a judgment against the insured, but there is held to be sufficient controversy between the insurer and the injured person that a declaratory judgment is permissible." 10 Wright & Miller, Federal Practice and Procedure: Civil, § 2757, p 759 (1973).

In this case, plaintiff was faced with threats of legal action by the DNR. Although, as defendant argues, the DNR could seek legal redress in the form of an order for abatement of water pollution (MCL 323.6; MSA 3.526), a criminal complaint (MCL 323.9; MSA 3.529), or injunctive relief (MCL 323.10; MSA 3.529[1]), and so possibly never seek a remedy covered by the insurance policy, plaintiff nevertheless needed to know whether defendant would be required to defend against a covered remedy should such a remedy be sought. Only with this knowledge could plaintiff choose between voluntarily complying with the DNR's very real and repeated demands and opposing the DNR's actions.

Defendant next argues that its due process rights were violated by the trial court's order requiring defendant to pay for the expenses of the studies done prior to entry of the declaratory judgment. Defendant argues that a full hearing is required by the water resources act, MCL 323.1 *et seq.;* MSA 3.521 *et seq.,* before an order to abate pollution may be enforced. In this case, plaintiff and the DNR agreed that the plaintiff should move immediately to prevent further off-site contamination, investigate the extent of the contamination, and implement a plan for preventing further contamination, and so plaintiff proceeded without a hearing. Defendant argues that this agreement denied defendant the opportunity to appear at a

hearing to contest the necessity and reasonableness of the DNR's demands.

MCL 323.7; MSA 3.527 and MCL 323.8; MSA 3.528 provide the statutory framework for hearings to determine the existence of and means of correcting unlawful water pollution. MCL 323.7; MSA 3.527 explicitly provides for disposition of a case without a hearing where the alleged polluter "agrees with the terms of the proposed permit and period of time for abatement of pollution which the commission deems necessary". Such an agreement constitutes an "order" of the Water Resources Commission and may be attacked by an interested or aggrieved person. *White Lake Improvement Ass'n v City of Whitehall,* 22 Mich App 262, 276-277; 177 NW2d 473 (1970). The right to attack this "order" is set forth in MCL 323.8; MSA 3.528, which provides that any aggrieved person may request a hearing on the "order", and appear, present witnesses, and submit evidence at the hearing.

Defendant was thus entitled to a hearing before the Water Resources Commission upon request. Defendant, however, decided not to request a hearing, relying instead upon its denial of any obligation to plaintiff under the insurance contract. Plaintiff informed defendant throughout the proceedings of the DNR's demands and repeatedly requested defendant's intercession under the insurance contract. Under such circumstances, we can only conclude that defendant waived its right to request a hearing· and cannot now complain that plaintiff reached an agreement with the DNR. *Glover v Kalamazoo,* 98 Mich App 465, 469; 296 NW2d 280 (1980), *lv den* 411 Mich 951 (1981).

Defendant also questions the trial court's ruling that defendant is "obligated to defend any claim or

action, and to pay for any costs of [plaintiff], for correcting chemical contamination, imposed by or resulting from a determination by a tribunal of competent jurisdiction". Defendant argues that this ruling incorrectly construes the insurance agreement to cover sums of money expended by plaintiff in response to equitable or injunctive orders, instead of covering only money paid or ordered to be paid as *compensation* for injury or loss. The issue has since been sharpened by the Attorney General's having filed a lawsuit against plaintiff seeking an injunction to compel plaintiff to immediately begin purging and cleansing of the contaminated ground water, civil penalties of up to $10,000 per day, "all costs of this action, including enforcement costs, laboratory expenses, and attorney fees", and "any other relief [the] court deems proper and just".

The contract between defendant and plaintiff obligates defendant to "defend any suit against [plaintiff] seeking damages" and to pay "all sums which [plaintiff] shall become obligated to pay by reason of liability imposed by law upon [plaintiff] * * * as damages because of * * * property damage". Thus, both the obligation to defend and the obligation to pay depend on the definition of "damages". As stated earlier, defendant interprets "damages" as compensation for injury or loss, and argues that costs incurred by plaintiff in complying with equitable or injunctive orders are noncompensatory. Plaintiff and intervenor interpret "damages" as sums which the insured is obligated to pay by reason of liability imposed upon him by law (in this case, MCL 323.6; MSA 3.526 and MCL 323.10; MSA 3.529[1]).

Defendant's argument is persuasive and supported by decisions from several other jurisdic-

tions: *Aetna Casualty & Surety Co v Hanna,* 224 F2d 499 (CA 5, 1955); *Ladd Construction Co v Ins Co of North America,* 73 Ill App 3d 43; 29 Ill Dec 305; 391 NE2d 568 (1979); *Desrochers v New York Casualty Co,* 99 NH 129; 106 A2d 196 (1954). In all three cases, the insurance provisions were similar, if not identical, to the insurance provision at issue here. The reasoning underlying the three opinions is aptly expressed in the following cite from *Aetna Casualty Co, supra,* p 503, where the court discusses whether the costs of complying with an injunction to remove fill dirt from a neighbor's property constitute damages:

"Insofar as coverage is concerned, the obligation is solely 'to pay,' not to remove fill dirt, rocks and boulders, under Court order or otherwise. It is equally unreasonable to view the obligation as providing reimbursement to the Insured, for the undertaking is to pay *'on behalf of'* the Insured whatever he 'shall become obligated to pay by reason of the liability imposed upon him by law * * * *for damages* because of injury or destruction of property, * * *.'

"Clearly, the policy covers only payments to third persons when those persons have a legal claim for damages against the Insured on account of injury to or destruction of property." (Emphasis in original.)

In our opinion, this reasoning interprets "damages" too narrowly. Under MCL 323.10; MSA 3.529(1), the Attorney General is empowered to file a suit "to recover the full value of the injuries done to the natural resources of the state * * *". This language clearly indicates the state's interest in its natural resources. Defendant agrees that the contamination of subterranean and percolating water as a result of the fire is "physical injury to tangible property" within the terms of the insurance policy. If the state were to sue in court to

recover in traditional "damages", including the state's costs incurred in cleaning up the contamination, for the injury to the ground water, defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs. The damage to the natural resources is simply measured in the cost to restore the water to its original state. *Chemical Applications Co, Inc v The Home Indemnity Co,* 425 F Supp 777, 778 (D Mass, 1977); *Lansco, Inc v Dep't of Environmental Protection,* 138 NJ Super 275, 284; 350 A2d 520, 525 (1975), *aff'd* 145 NJ Super 433 (1976), *cert den* 73 NJ 57; 372 A2d 322 (1977). We therefore affirm the trial court. Defendant must defend and indemnify plaintiff against such claims and costs under the insurance policy.

Defendant next argues that damage to the ground water beneath plaintiff's property was excluded from the insurance policy's coverage because the water was "property owned by the insured". The trial court ruled that percolating water is not owned by the owner of the land under which it flows and so does not fit within the policy's exclusion. We agree.

The use of percolating water in Michigan has long been governed by *Schenk v City of Ann Arbor,* 196 Mich 75; 163 NW 109 (1917). *Schenk* rejected the so-called English rule established by the Court of Exchequer in *Acton v Blundell,* 12 M & W 324; 152 Eng Rep 1223 (1843), in favor of a rule known as "reasonable use".

The English rule permitted unlimited use of

ground water by a landowner without regard to any resulting injury to neighboring landowners. In *Maerz v United States Steel Corp,* 116 Mich App 710, 713-714; 323 NW2d 524 (1982), a panel of this Court traced the theories underlying this rule and found that the rule was premised at least in part on notions of property:

"(Percolating) water is regarded as a part of the soil and to which an adjoining proprietor has no absolute or natural right. It belongs to the owner of the land, and its diversion and appropriation by him for the improvement or benefit of his estate cannot be made the basis for complaint against him by anyone, however grievous the resulting injury may be." (Emphasis changed.)

The rule was also premised on the rule of capture, because a strong pump could draw off a neighbor's water, which, while it remained in place, theoretically belonged only to the neighbor. 4 Restatement Torts, 2d, § 848, p 256.

The "reasonable use" rule adopted in lieu of the English rule by the *Schenck* Court permitted use by a landowner of the percolating waters as long as such use did not interfere with a neighbor's reasonable use of the water beneath his land. In adopting this rule, the *Schenck* Court clearly rejected the right of absolute ownership over percolating ground water:

"If the owner of Whiteacre is the absolute proprietor of all the percolating water found beneath the soil, the owner of the neighboring Blackacre must, by the same rule, have the like proprietorship in his own percolating water. How, then, can it be consistent with the declared principle to allow the owner of Whiteacre to withdraw, by pumping or otherwise, not only all the percolating water that is normally subjacent to his own soil, but also, and at the same time, the whole or a part of that

which is normally subjacent to Blackacre? Where percolating water exists in a state of nature generally throughout a tract of land, whose parcels are held in several ownership by different proprietors, it is, in the nature of things, impossible to accord to each of these proprietors the absolute right to withdraw *ad libitum* all percolating water which may be reached by a well or pump upon any one of the several lots, for such withdrawal by one owner necessarily interferes to some extent with the enjoyment of the like privilege and opportunity by the other owners." *Id.,* p 83, quoting from *Meeker v City of East Orange,* 77 NJL 623; 74 A 379 (1909).

*Schenck v City of Ann Arbor, supra,* remains the law today. We therefore affirm the trial court's decision.

The final issue before us is whether the trial court erred in permitting Dr. Balkumar Shah to give an expert opinion based partly on facts and data not in evidence. We conclude the trial court did not err. MRE 703 clearly provides that the trial court may permit expert testimony based on facts or data not in evidence. The opposing party retains the right to delve into the underlying facts or data in cross-examination. MRE 705.

Defendant also argues that the record does not provide sufficient evidence of ground water contamination to support the trial court's finding. This issue was not preserved for appeal because defendant stipulated below to the fact of contamination.

Affirmed.