**ANDERSON DEVELOPMENT COMPANY, a Michigan corporation, Plaintiff–Appellant, Cross–Appellee,**

v.

**TRAVELERS INDEMNITY COMPANY, Defendant–Appellee, Cross–Appellant.**

Nos. 93–2140, 93–2166.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1994.

Decided March 20, 1995.

Charles E. Barbieri Foster, Swift, Collins & Smith, Lansing, MI (argued and briefed), for plaintiff-appellant, cross-appellee Anderson Development Co.

Stephen M. Kelley, Kelley, Casey & Clarke, Detroit, MI (argued and briefed), for defendant-appellee, cross-appellant Travelers Indem. Co.

Laura A. Foggan, Wiley, Rein & Fielding, Washington, DC (briefed), for amicus curiae Ins. Environmental Litigation Ass'n.

Before: BROWN, RYAN, and BOGGS, Circuit Judges.

BROWN, J., delivered the opinion of the court, in which BOGGS, J., joined. RYAN, J., (pp. —— – ——), delivered a separate concurring opinion and concurred in the judgment.

**BAILEY BROWN, Circuit Judge.**

The insured, Anderson Development Company ("ADC"), brought a declaratory judgment action against its insurer, Travelers Indemnity Company ("Travelers"), seeking coverage under its insurance policies for costs of defense and indemnification resulting from a government mandated clean-up. Applying Michigan law, the district court granted summary judgment in part for the insurer, Travelers, holding that under the policies, Travelers was not required to provide a defense or provide indemnification with respect to the clean-up. On the other hand, the district court granted summary judgment in part for the insured, ADC, holding that an "owned property" exclusion clause did not apply to government imposed environmental clean-up costs. The judgment, however, fully disposed of the case in favor of Travelers. Both ADC and Travelers appeal the district court's decision. We REVERSE the grant of summary judgment in favor of Travelers and AFFIRM the summary judgment in favor of ADC.

**I.**

ADC, which is headquartered in Adrian, Michigan, is principally involved in the manufacture and sale of specialty organic materials. Between approximately 1970 and 1979, ADC manufactured a chemical named 4-4 methylene-bis for use in its production process, also known by its acronym "MBOCA," and by ADC's trade name "Curene 442." Curene 442 is a known animal carcinogen, and a suspected human carcinogen. ADC apparently believed that Curene 442 was insoluble in water, and to prevent the threat of any environmental damages, it created a filtering system to avert the discharge of Curene 442 into the general wastewater stream. Nevertheless, in October 1973, the Michigan Department of Natural Resources (MDNR) informed ADC that its wastewater contained excessive levels of potentially hazardous chemicals. In response, ADC designed a lagoon to operate as a settling pond to handle the occasional accidental discharge of Curene 442 process water. Because the lagoon discharge piping was connected to the sewer system, and because Curene 442 was in fact soluble, tainted wastewater from the ADC property ultimately found its way into the Adrian municipal water and sewage treatment plant.

*A. The Clean-up*

In 1979, despite the lagoon and filter system, the MDNR ordered the City of Adrian to no longer accept ADC's wastewater because it was tainted with Curene 442. It further ordered ADC to cease producing Curene 442.

In 1983, the United States Environmental Protection Agency (EPA) designated ADC's Adrian facility as a site under the National Priorities List, pursuant to § 105 of the Comprehensive Environmental Response, Compensation, and Liability Act. 42 U.S.C. § 9605 ("CERCLA"). Moreover, in 1985, the EPA sent ADC formal notification that it considered ADC to be a "potentially responsible party" for the release or threatened release of hazardous substances at the plant resulting in possible soil and/or groundwater contamination. This is commonly referred to as a "PRP letter." The letter demanded that ADC agree to provide any relevant information and undertake a remedial investigation/feasibility study. The EPA also warned ADC in the letter that its failure to comply with these requests would result in ADC's being liable for "all costs associated with the removal or remedial action and all other necessary costs incurred in cleaning up the site, including investigation, planning and enforcement." ADC notified Travelers, its insurer, of these events but Travelers responded that it was not prepared to provide a defense or coverage with respect to the matter. ADC thereafter agreed to conduct the study which did in fact reveal contamination in selected areas surrounding the lagoon. The EPA later determined that an environmental clean-up would be required. The EPA and ADC subsequently entered into a consent decree wherein ADC agreed to perform the response and clean-up activities required by the EPA. The clean-up has cost ADC roughly six to eight million dollars.

## B. The Insurance Policy

Travelers and ADC entered into a series of general liability and umbrella insurance contracts spanning a period of 1974 to 1980. The contracts covering the Adrian facility provided in pertinent part that:

> The Travelers will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as *damages* because of body injury or property

damage to which this insurance applies, caused by an occurrence.[1]

As to Travelers' duty to defend, the policies further provided that:

> Travelers shall have the right and duty to defend any *suit* against the Insured seeking damages on account of such bodily injury or property damage....

Each of the Travelers/ADC policies also included an "owned property" exclusion which provided that the policies do not cover property damage to:

> 1) property owned or occupied by or rented to the Insured,
>
> 2) property used by the Insured, or
>
> 3) property in the care, or control of the Insured or as to which the Insured is for any purpose exercising physical control....

## C. The Lawsuit

ADC filed suit against Travelers in Michigan state court seeking a declaration that its insurance policies cover all the costs of defense and indemnification resulting from the EPA/ADC negotiations and environmental clean-up. Travelers removed the case to federal court based on diversity jurisdiction.[2] Travelers contended that the above coverage provisions were not invoked inasmuch as there was not a "suit" to defend, there were no "damages" to indemnify, and the only injuries involved were damages to ADC's *own* property. Both parties moved for summary judgment. Germane to this appeal, the district court: 1) granted summary judgment in favor of Travelers on the duty to defend issue, holding that the actions taken by the EPA and ADC, including the EPA letter and the filing of the consent decree, did not constitute a "suit" which would trigger coverage under the policies; 2) granted summary judgment in favor of Travelers on the duty to indemnify issue, holding that the response and environmental clean-up costs were not "damages" as contemplated by the policies; and 3) granted summary judgment in favor

---

1. The umbrella policies imposed a similar obligation with an added obligation to indemnify or cover sums assumed under a contract.

2. ADC is a Michigan corporation with its principal place of business in Michigan, and Travelers is a Connecticut corporation with its principal place of business in Connecticut.

of ADC with respect to the "owned property" exclusion issue, finding that the clause was not applicable to environmental clean-up costs involved in this case. The judgment fully disposed of the case in favor of Travelers. Both parties have timely appealed.

## II.

■ Review of a grant of summary judgment is de novo, utilizing the same test used by the district court to determine whether summary judgment is appropriate. *Deaton v. Montgomery County, Ohio,* 989 F.2d 885, 887 (6th Cir.1993). A court shall render summary judgment when, viewing the evidence in a light most favorable to the non-moving party, there is no genuine issue as to any material fact, reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion is made. *See LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993).

Because this federal diversity action was brought in Michigan, Michigan choice of law rules apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Likewise, the parties agree that under Michigan's choice of law rules, Michigan law governs the interpretation of the insurance policy provisions at issue.

■ Michigan's "[f]oremost" principle for construing insurance contracts "is the maxim that an insurance policy must be enforced in accordance with its terms." *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.,* 445 Mich. 558, 519 N.W.2d 864, 868 (1994). If the contract fails to define a term, the court must interpret the term according to its " 'commonly used meaning,' taking into account the reasonable expectations of the parties." *Id.* 519 N.W.2d at 868–69 (citations omitted). Further, if the term is ambiguous, it must be construed in a manner most favorable to the insured. *Id.* at 869.

Under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court deciding a diversity case under state law must apply the law of the state's highest court. If, however, the state's highest court

has not decided the applicable law, then the federal court must ascertain the state law from "all relevant data." *Bailey v. V. & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985). A state's intermediate appellate court decision announcing a rule of law is a "datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *FL Aerospace v. Aetna Casualty & Sur. Co.,* 897 F.2d 214, 218–19 (6th Cir.1990) (quoting *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)). A federal court may in this situation also consider decisions from other jurisdictions. *Bailey,* 770 F.2d at 604.

### A. Under Michigan law, a PRP letter constitutes a suit.

■ As noted, the district court determined that the issuance of the PRP letter and other actions taken by the EPA did not constitute a "suit" triggering Travelers' duty to defend ADC. In doing so, the district court apparently relied on the holding of this court in *Ray Industries, Inc. v. Liberty Mutual Insurance Co.,* 974 F.2d 754 (6th Cir.1992) (interpreting Michigan law). At the time *Ray Industries* was decided, the Michigan Supreme Court had not ruled on the issue, and therefore, a panel of this court was required to "guess" as to what the law in Michigan was. *Ray Industries,* 974 F.2d at 758. Under substantially similar facts, the court concluded that the Michigan Supreme Court would adopt a "narrow" definition of the word "suit" and thus held that the PRP letter would not trigger an insurer's duty to defend. *Id.*

The Michigan Supreme Court, however, recently having had the opportunity to rule on this exact issue, rejected the holding of *Ray Industries,* and in fact held that a PRP letter issued by the EPA is the functional equivalent of a "suit" brought in a court of law. *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.,* 445 Mich. 558, 519 N.W.2d 864, 870 (1994). Factually, *Bronson Plating* is also substantially similar to our case: The insurer brought an action against its insured seeking a declaration that it had

no duty to defend or indemnify the insured with respect to EPA administrative actions (PRP letter) regarding environmental contamination of the insured's operation site. Moreover, the insurance policy provisions with respect to the insurer's duty to defend and indemnify, as well as the relevant portions of the PRP letter, were essentially identical to those in our case. The court first noted that the term "suit" is ambiguous and capable of application to nontraditional legal actions that are the functional equivalent of a suit brought in a court of law. Under this definition, the court concluded, a PRP letter constitutes the initiation of a suit that the insurers are obligated to defend. The court reasoned that "[t]he significant authority given to the EPA in such matters allows it essentially to usurp the traditional role of a court in determining and apportioning liability," and may be viewed as "coercing the voluntary participation of PRP's." *Id.* 519 N.W.2d at 871–72.

In light of the *Bronson Plating* decision, we reverse the district court as to the first issue and hold that the PRP letter received by ADC constituted the initiation of a suit triggering Travelers' duty to defend.

> B. *Environmental clean-up costs mandated by the EPA constitute "damages."*

▇ We now turn to the issue of whether environmental response and clean-up costs mandated by the EPA are "damages" within the meaning of the insurance contract, thereby triggering Travelers' duty to indemnify. Travelers notes that these costs are equitable in nature. Likewise, Travelers contends that the word "damages" is clear and unambiguous, and that it refers to legal and not equitable relief. Hence, Travelers maintains that the district court correctly held that the term "damages" does not contemplate the relief sought here.

Contrary to Travelers' contention, the issue of whether response and clean-up costs mandated by an environmental regulatory agency are damages is far from clear and has been the subject of extensive nationwide litigation. *See Maryland Casualty Co. v. Wausau Chem. Corp.*, 809 F.Supp. 680, 690–91

(W.D.Wis.1992)(compiling conflicting cases). For example, two circuit courts of appeals cases have reached contrary conclusions interpreting the same state law. *Compare Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977 (8th Cir.)(denying recovery under Missouri law, concluding that "damages" refers only to compensatory relief which does not include clean-up costs), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988), *with Independent Petrochemical Corp. v. Aetna Casualty and Sur. Co.*, 944 F.2d 940, 946–47 (D.C.Cir.1991)(granting recovery to insured under Missouri law, concluding that "the lay insured would not distinguish between legal and equitable relief when construing 'damages.'"), *cert. denied*, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992). The Michigan Supreme Court, however, has yet to address the issue. Nevertheless, ADC contends that, based on Michigan appellate caselaw directly on point, the district court erred in finding the "as damages" provision inapplicable.

In *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983), the Michigan Court of Appeals specifically addressed the question whether environmental clean-up costs constituted damages under the insurance policies at issue. In that case, the Michigan Department of Natural Resources notified the insured that the insured had the obligation to conduct an investigation regarding the extent of on-site contamination and to correct the same. The Department threatened legal action if the insured did not comply. The insured later brought an action against its insurer, Travelers, for a declaratory judgment seeking coverage under the insurance contract for costs incurred in determining and correcting the contamination.

As in our case, Travelers attempted to avoid liability on the basis that the costs incurred by the insured were not compensatory in nature, and therefore, were not "damages" within the meaning of the policy. The Michigan Court of Appeals disagreed. The court explained:

> [T]he Attorney General is empowered to file a suit "to recover the full value of the

injuries done to the natural resources of the state".... If the state were to sue in court to recover any traditional "damages," including the state's costs incurred in cleaning up the contamination, ,... defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs.

*Id.* 336 N.W.2d at 843 (citations omitted). This position has been generally accepted by other Michigan appellate courts. *See Polkow v. Citizens Ins. Co. of America*, 180 Mich. App. 651, 447 N.W.2d 853 (1989) (response and clean-up costs with respect to environmental contamination are damages within the meaning of an insurance policy), *rev'd on other grounds*, 438 Mich. 174, 476 N.W.2d 382 (1991); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 75 (E.D.Mich. 1987) (applying Michigan law) ("Damages" include money spent to clean up environmental contamination); *Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich.App. 706, 444 N.W.2d 813, 819 (1989)(holding correction of contamination compensable under insurance policies), *rev'd on other grounds*, 438 Mich. 197, 476 N.W.2d 392 (1991).

We construe these Michigan appellate court cases to hold that response and environmental clean-up costs mandated by the EPA constitute damages. The fact that the insured cooperates and assumes the obligation to conduct the clean-up, rather than forcing the EPA to incur the expenses of a clean-up and then bring a coercive suit, does not change the bottom line that a legal obligation exists. Accordingly, we reverse the district court as to the second issue and hold that, under Michigan law, government imposed environmental clean-up costs constitute "damages."

*C. An "owned property" exclusion clause does not apply to environmental clean-up costs mandated by the EPA.*

■ Travelers, on cross-appeal, contends that the district court erred in failing to enforce the "owned property" exclusion in the Travelers/ADC insurance contracts. As stated, this exclusion bars coverage for "property damage to (1) property owned or occupied by or rented to the insured...." In our case, Travelers notes that the only clean-up mandated by the EPA is for contamination on ADC's own property, specifically the lagoon. Travelers contends, therefore, that since ADC is not obligated to clean up anyone else's property, the "owned property" exclusion in the parties' contracts excludes this situation from the scope of coverage.

ADC contends that the district court properly found that, under Michigan law, the "owned property" exclusion does not preclude coverage. ADC, again relying on Michigan appellate court authority for support, contends that where the contamination has spread or threatens to spread to adjacent property, to groundwater, or to other natural resources, an "owned property" exclusion will not bar coverage. *Polkow*, 447 N.W.2d at 857; *Upjohn Co.*, 444 N.W.2d at 818–20; *United States Aviex Co.*, 336 N.W.2d at 843–44.

In *Polkow*, for example, an insured brought suit against its insurer for soil and groundwater contamination clean-up costs associated with the insured's business operations in hauling and storing waste oil. The insurer argued that any contamination present was limited to the insured's own property and thereby excluded from coverage under its "owned property" provision. The *Polkow* court first determined that groundwater is not owned by the property owner, but rather, by the state. Thus, such contamination does not fit within the policy's exclusion. What is significant, however, is that the court went on to announce a broad government interest in preserving the environment:

> Alternatively, we conclude that the alleged contamination in this case falls outside of the policy exclusion for damage to the insured's own property.... We hold that these allegations are essentially for injury to the public interest in the well-being of the environment and natural resources of this state.

*Id.* It is this strong public interest, the court went on to note, that vests the EPA and other regulatory organizations with the significant authority to compel cooperation, remediation, and enforcement in such matters. Another Michigan Court of Appeals has expressly adopted this broad approach. *Upjohn Co.*, 444 N.W.2d at 819 ("We note that the improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also to the government because of its independent interest, behind the titles of its citizens, in all the air and earth (i.e., its natural resources) within its domain."). Thus, these courts recognized, in environmental contamination cleanup cases, an independent governmental interest that supersedes any "owned property" exclusion in the policies.

In the present case, we decline to adopt Travelers' contention that the contamination poses no threat to the environment. The Record of Decision, incorporated into the consent decree between the EPA and the ADC, states: "Actual or threatened releases of hazardous substances from this site, if not addressed by implementing the remedial action selected in this Record of Decision, may present an imminent and substantial endangerment to public health, welfare, or the environment." We accept the determinations of the EPA, as presumably the district court did, and conclude that the Adrian site posed at least a significantly probable threat to the environment.

The Michigan Supreme Court could very well rely on the above Michigan appellate court authority to disallow the application of any "owned property" exclusion. We think, however, that the Michigan Supreme Court might also find somewhat more persuasive the analysis set forth in *Patz v. St. Paul Fire & Marine Insurance Co.*, 15 F.3d 699 (7th Cir.1994), a recent Seventh Circuit Court of Appeals decision. In *Patz*, insureds sought to recover from their insurers environmental clean-up costs that were incurred because the state ordered the insureds to remedy the soil and groundwater contamination that was, as in our case, exclusively on the insured's property. The Seventh Circuit, Posner, J., rejected the applicability of the owned property exclusion to government mandated re-

sponse costs, making a critical distinction between casualty insurance and liability insurance. The court concluded that the plaintiffs were not seeking to recover for damage to their property, but rather, they were seeking the cost of liability that the Department of Natural Resources imposed on them. *Id.* at 705. The court reasoned:

> [The insureds] are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.

*Id.* In essence, the court concluded that the clean-up costs constituted an existing liability to the government rather than a claim for the decrease in the value of the "owned" property. In doing so, the court determined that ownership of the groundwater and/or contaminated property is irrelevant. The *Patz* court qualified its holding, however, and warned that the mere desire of an insured to *voluntarily* reduce potential future liability could very well be barred by the owned property exclusion. The court noted, "The owner of an automobile cannot charge the expense of a fancy new braking system to his liability insurer on the ground that the system will make it less likely that he will injure someone in an accident." *Id. See also Joslyn Mfg. Co. v. Liberty Mut. Ins. Co.*, 23 F.3d 1212 (7th Cir.1994)(finding "owned property" exclusion inapplicable, following the reasoning of *Patz*).

Our ruling is in accordance with that of *Patz*. Although ADC cooperated voluntarily, it was under a government mandate to conduct the environmental clean-up. Thus, consistent with our prior conclusions that the PRP letter constituted a suit for which ADC has incurred damages, there was indeed liability to a third party—the EPA.

Considering the strong uniformity of the Michigan appellate courts, and the persua-

sive reasoning of the *Patz* decision, we hold that the "owned property" exclusion does not bar recovery for ADC's liability. We therefore affirm the district court's determination on this issue.

We therefore **REVERSE** the district court's grant of summary judgment for the Defendant/Appellee, Travelers, **AFFIRM** the grant of summary judgment on behalf of the Plaintiff/Appellant, ADC, and **REMAND** to the district court for further proceedings in accordance with this opinion.

RYAN, Circuit Judge, concurring and concurring in the judgment.

Because we sit, in this case, under the limiting authority of our diversity jurisdiction, our duty is to decide this case as we think the Michigan Supreme Court would. For that reason alone, I am compelled to agree with the result reached in the majority opinion on all three of the issues addressed, but to disagree with the reasoning offered in support of the second issue, and to add a further thought on the third issue. I reach these conclusions solely because of the Michigan Supreme Court's decision in *Michigan Millers Mutual Insurance Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864 (1994). Although we are free to disagree, as indeed I do, with the reasoning and the result announced in *Bronson Plating*, we are not free to disregard it, and I'm afraid the majority opinion does.

## I.

With respect to the first issue—the meaning of the term "suit" in the Travelers policy—I agree that the Michigan Supreme Court, which concluded that the term of art "suit" in the Michigan Millers Mutual Insurance policy involved in the *Bronson Plating* case includes a "potentially responsible party" (PRP) letter from the EPA, would take the same position with respect to the PRP letter in this case because the Travelers policy is essentially identical to the Michigan Millers policy.

## II.

*Bronson Plating* also signals that the Michigan Supreme Court would likely hold that the term "damages" in the Travelers policy includes environmental cleanup costs mandated by the EPA, but not, I think, for the reasons the majority suggests.

A court that holds that a threatening letter from the EPA is a "suit," as that term is used in a liability insurance policy indistinguishable from the Travelers' in this case, because it thinks that a "typical layperson" would think so, would surely hold, on the same reasoning, that environmental cleanup costs are "damages" under the same policy. Indeed, that is the conclusion reached by a sister circuit that referred to the lay dictionary definition of "damages." *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 944 F.2d 940, 945–46 (D.C.Cir.1991), *cert. denied*, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992). But that is not the analytical route taken by the Michigan Court of Appeals in the several cases cited in the majority's opinion. Rather, those cases simply declare that when the government incurs environmental cleanup costs, and then sues the insured to recover those costs, the insurer's duty to pay "would be clear"; "[i]t is merely fortuitous" that the government might sometimes order cleanup rather than sue for recovery. *E.g., United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838, 843 (1983). This dubious reasoning is a far cry from the simple, if indeed remarkable, approach that the Michigan Supreme Court would likely take; *viz*, that the layperson's understanding of "damages" includes costs incurred to restore the environment.

## III.

Finally, I do not think the Michigan Supreme Court would follow the reasoning of the Michigan appellate court authorities cited in the majority's opinion with respect to the "owned property" exclusion issue. First, those cases hold that the state's interest in groundwater renders the "owned property" exclusion in the Travelers policy inapplicable. "Owned property" exclusions ordinarily exclude not only coverage for property "owned"

**1136**

by the insured, but also property in the insured's "custody or control"; the exclusion at issue in our case employs that typical language. The Michigan appellate court cases misread the "owned property" exclusion by glossing over the "custody or control" language. Groundwater beneath the insured's property is nevertheless under his "control" even if not "owned" by him—at least a "typical layperson" is likely to think so, and that is the standard the Michigan Supreme Court would apply.

But I agree with the majority that, rather than rely upon the state appellate court's reasoning, the Michigan Supreme Court would probably hold the Travelers "owned property" exclusion inapplicable based on the reasoning of *Patz v. St. Paul Fire & Marine Insurance Co.,* 15 F.3d 699, 705 (7th Cir. 1994), which distinguishes between "liability" and "casualty" insurance coverage. Indeed, in my view, that is the more compelling ground, and, coincidentally, is consistent with the Michigan Supreme Court's reliance on "typical laypersons" for construing the meaning of "ambiguous" insurance contract terms. The Travelers policy states that it provides "Comprehensive General Liability" insurance, and repeatedly refers to coverage for "liability." Thus, the "typical layperson's" reading of the "owned property" exclusion, which excludes coverage for property *damage,* would interpret coverage for the response costs—a *liability* to the EPA—unaffected by the exclusion.

For the foregoing reasons, I concur in the result reached in the majority's opinion.