NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0682n.06

Case No. 16-1268

FILED
Dec 16, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

HOME-OWNERS INSURANCE )
COMPANY, )
)
    Plaintiff-Appellee, )
)
v. )
) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR
ALLIED PROPERTY AND CASUALTY ) THE WESTERN DISTRICT OF
INSURANCE COMPANY; AMCO ) MICHIGAN
INSURANCE COMPANY )
)
    Defendants-Appellants. )

BEFORE: GUY, BOGGS, and GRIFFIN, Circuit Judges.

**BOGGS, Circuit Judge.** While driving southbound on 46th Street in Overisel Township, Michigan, Jason Onstott sped through a stop sign at 140th Avenue, striking the passenger side of a pick-up truck. David Bremer, the passenger in the pick-up truck, suffered a lacerated liver and internal bleeding and was flown to a hospital in Grand Rapids, where he died during surgery; Glenn Alan Kleinheksel, the driver, suffered a broken pelvis, broken leg, broken wrist, broken foot, and compressed vertebrae. Onstott, an employee and officer of Western Tel-Com (WTC), had been on his way to attend an interview with a prospective WTC employee at the time of the accident. Underlying litigation in Allegan County Circuit Court resulted in settlement agreements that resolved claims by Bremer's estate and Kleinheksel against Onstott

and WTC.  In Allegan County criminal court, Onstott pleaded 'no contest' to, and was found guilty of, "moving violation causing death" and "moving violation causing serious impairment of a body function" under Mich. Comp. Laws § 257.601d,  for which Onstott spent five days in jail, served six months on probation, and paid fines and fees.

Separately, Plaintiff Home-Owners Insurance Company (Home-Owners), the issuer of Onstott's automobile and personal-insurance policies, sued Defendants Allied Property and Casualty Insurance Company (Allied) and AMCO Insurance Company (AMCO), the issuers of WTC's commercial-insurance policies, seeking a declaratory judgment that Defendants bore the ultimate responsibility to cover the liability of Onstott and WTC for the accident, because WTC was contractually obligated to indemnify Onstott against tort liability and Defendants were in turn contractually obligated to indemnify WTC against that liability.  The district court granted summary judgment for Home-Owners.  We affirm.

I

WTC, a service contractor in the telecommunications-cabling industry, is a Michigan corporation headquartered in Holland, Michigan.  At the time of the accident, Onstott and Kurt Friedriechsen were WTC's only directors, officers, and shareholders: Friedriechsen was president and secretary, and Onstott was vice president and treasurer.  Including Onstott and Friedriechsen, WTC employed forty to fifty individuals at offices in Holland and Livonia.

The WTC bylaws and the parties' respective insurance policies provide the textual context for this dispute.  Article 8 of WTC's bylaws provides for indemnification of its officers and directors as follows:

> Section 1. **Definitions.** As used in this Article 8, any word or words defined in sections 561–566 of [Michigan's Business Corporation] Act (the "*Indemnification Section*") shall have the same meaning as provided in the Indemnification Section.

Section 2. **Indemnification of Officers and Directors.** The corporation shall indemnify and advance expenses to a director or officer of the corporation in connection with a proceeding to the fullest extent permitted by and in accordance with the Indemnification Section.

Section 2 has the effect of turning the permissive-indemnification provision in the Michigan Business Corporation Act (MBCA), which gives corporations "the power to indemnify" a "director, officer, employee, or agent of the corporation," into a mandatory-indemnification provision with regard to officers and directors. *See* Mich. Comp. Laws § 450.1561. The MBCA provides for indemnification if the indemnitee "acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation." *Ibid.* The parties agree that Onstott was an officer or director of WTC and that he was acting in the course of his employment at the time of the accident. Onstott and Friedriechsen gave uncontradicted testimony that Onstott was traveling at WTC's request. The parties dispute, however, whether Onstott's unlawful acts of speeding and running a stop sign prevent him from satisfying the good-faith-and-best-interests requirement of the MBCA, and thus prevent him from qualifying for mandatory indemnification.

Two Home-Owners insurance policies, one Allied policy, and one AMCO policy are the only possible sources of coverage for the liability of Onstott and WTC. These policies provide coverage as follows:

1. **Home-Owners automobile policy** ("personal auto policy"). This policy names Jason (and his wife Julie) Onstott as the insured and provides liability coverage with limits of $500,000 for personal injury and $500,000 for property damage. The policy includes a subrogation clause that entitles Home-Owners to any "right to recover damages from another" that is held by any "person to or for whom" Home-Owners makes a payment under the policy.

3

2. **Home-Owners executive umbrella insurance policy** ("personal umbrella policy"). This policy names the Onstotts as the insured and provides liability coverage up to $1,000,000 in "excess of such other insurance" that may be applicable to a covered loss.[1]

3. **Allied business automobile policy** ("commercial auto policy"). This policy names WTC as the insured and provides liability coverage with a $1,000,000 limit. This policy covers "all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies caused by an accident and resulting from the ownership, maintenance or use of a covered auto," and it defines "covered auto" as "Any Auto." The parties agree that Onstott himself is not an "insured" under this policy. But damages "resulting from" WTC's "use of a covered auto," which would include WTC's use of Onstott's auto, are covered. Most importantly, this policy covers "liability for damages . . . [a]ssumed in a contract or agreement that is an *insured contract*." The policy later defines "insured contract" as including "[t]hat part of any other contract . . . under which you assume the tort liability of another to pay for bodily injury or property damage to a third party or organization." The district court held that the mandatory-indemnification provision in the WTC bylaws applies to Onstott and constitutes an insured contract under these terms, thus placing Allied on the hook for WTC's mandatory indemnification of Onstott.

4. **AMCO commercial liability insurance policy** ("commercial umbrella policy"). This policy names WTC as the insured and provides, among other liability coverage, "excess follow form" liability up to $10,000,000 as second-tier coverage for losses covered by

---

[1] Umbrella policies work both to increase protection by operating as second-tier coverage for losses already covered and to fill in gaps in coverage by operating as first-tier coverage for losses not otherwise covered.

specified underlying policies, one of which is the Allied commercial auto policy. The excess follow-form coverage rises and falls with underlying policies' coverage: all losses—and only those losses—covered by the Allied commercial auto policy or other specified policies are also covered by the excess follow-form coverage.[2]

On April 2, 2014, Bremer's estate brought tort claims against Onstott and WTC in state court. One week later, Home-Owners sued Defendants, also in state court, for a declaratory judgment that Defendants' policies provided primary coverage for the liability of Onstott and WTC to Bremer and Kleinheksel. Defendants removed the action to the United States District Court for the Western District of Michigan. Defendants answered and counterclaimed for a declaratory judgment that Defendants' policies offered no coverage for Onstott directly and that, for WTC's direct or vicarious liability, the order of coverage was first the personal auto policy, then the personal umbrella policy, then the commercial auto policy, then the commercial umbrella policy.

The underlying litigation continued separately: Bremer's estate dropped its claim against WTC, and Kleinheksel brought tort claims against both Onstott and WTC. In February 2015, Onstott formally requested indemnification from WTC, which WTC denied at Defendants' direction. In April and May 2015, Kleinheksel and Bremer, respectively, settled their claims for undisclosed sums that the parties stipulate do not exceed $11 million combined. Home-Owners and Defendants were active participants in the negotiation of the settlement agreements, and Home-Owners and Defendants paid the settlements according to an agreed provisional

---

[2] This is important because if Home-Owners can prove that the commercial auto policy covers Onstott's liability, then the $10,000,000 commercial umbrella policy automatically kicks in to cover that liability as well.

allocation, so that Onstott and WTC would be released from both further liability and further litigation.

Home-Owners and Defendants each moved for summary judgment, and the district court granted summary judgment for Home-Owners, holding that the claim of Home-Owners for a declaratory judgment was justiciable, Onstott was covered by the mandatory indemnification because he satisfied the good-faith-and-best-interests standard, and Defendants' policies provided primary coverage for the liability of Onstott and WTC because WTC's agreement to indemnify Onstott was an insured contract for which the Allied commercial auto policy expressly provided primary coverage, and for which the AMCO commercial umbrella policy thus provided excess follow-form coverage. Defendants timely appealed.

We review the district court's grant of summary judgment de novo. *See Gradisher v. City of Akron*, 794 F.3d 574, 582 (6th Cir. 2015). We draw all reasonable inferences in favor of Defendants. *See Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008). If on "the record taken as a whole" no rational trier of fact could find for Defendants, then there is no genuine issue for trial, and Home-Owners is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Michigan law governs the issues on appeal, and we apply state law in accordance with the controlling decisions of the Michigan Supreme Court. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Sys.*, 249 F.3d 450, 454 (6th Cir. 2001) (citing *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir. 1996)). Where the Michigan Supreme Court has not yet addressed an issue presented, we predict how that court would rule in light of the decisions of the state

appellate courts and other "relevant data." *Ibid.* (quoting *Kingsley Assocs. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).

## II

We first address justiciability because it is a threshold question of jurisdiction. Defendants argue that Home-Owners' suit for a declaratory judgment is "premature and inadmissible" because Home-Owners "did not have statutory standing" to seek indemnification and because Onstott himself did not sue WTC for indemnification. Appellants' Br. 40–42; *see also* Defs.' Mot. for Summ. J. 3, citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ("The federal courts . . . do not render advisory opinions.") (citation omitted).

A case or controversy for the purpose of justiciability, however, "exists where a declaratory judgment is necessary to guide a litigant's future conduct in order to preserve his legal rights." *U.S. Aviex Co. v. Travelers Ins. Co.*, 336 N.W.2d 838, 841 (Mich. Ct. App. 1983). "A court is not precluded from reaching issues before actual injuries or losses have occurred." *Ibid.* (citing *Shavers v. Attorney Gen.*, 267 N.W.2d 72, 82 (Mich. 1978)); *see also Grp. Ins. Co. of Mich. v. Morelli*, 314 N.W.2d 672, 675 (Mich. Ct. App. 1981) (observing that "our literature abounds with case law where the insured or insurer has sought a declaratory action to determine disputed issues of coverage").

Here, when Home-Owners sought a declaratory judgment, there had already been claims asserted by Bremer and Kleinheksel, Onstott had already sought and been denied indemnification from WTC, and the total liability amount had been *liquidated and paid* under settlement agreements, leaving only the question of how to allocate that liability among the parties to Home-Owners' suit. The district court thus properly held that an actual controversy existed in this case, and that a declaratory judgment was necessary to guide the litigants' future

conduct.  Further, to the extent that Onstott himself and not Home-Owners had the statutory right of indemnification, Home-Owners is entitled to that right by virtue of the subrogation clause in the personal auto policy.  We therefore affirm the holding of the district court as to justiciability.

*Issue Two: Indemnification*

The second and core issue in this dispute is whether Onstott is entitled to mandatory indemnification under Article 8 of the WTC bylaws.  Mandatory indemnification applies if at the time of the accident, Onstott was acting "in good faith and in a manner he . . . reasonably believed to be in or not opposed to the best interests of" WTC.  Mich. Comp. Laws § 450.1561.  Good faith means "good intentions and the honest exercise of [one's] best judgment."  *People v. Downes*, 228 N.W.2d 212, 216–17 (Mich. 1975) (citation omitted); *see also Miller v. Riverwood Recreation Ctr., Inc.*, 546 N.W.2d 684, 689 (Mich. Ct. App. 1996) (noting that Black's Law Dictionary (6th ed.) "defines 'good faith,' in part, as 'an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage'").

A finding of intentional or willful misconduct will prohibit a finding of good faith, but mere negligence will not.  *See, e.g.*, *Odom v. Wayne County*, 760 N.W.2d 217, 224–26 (holding that a government employee acts in "good faith" so as to be entitled to state governmental immunity if he can show that he acted without malice); *Berger v. Katz*, No. 291663, 2011 WL 3209217, at *6 (Mich. Ct. App. July 28, 2011) (holding that indemnification was precluded where defendants engaged in "willfully unfair and oppressive conduct" against plaintiff minority shareholder).  The Michigan Supreme Court has essentially defined good faith as *not* acting in bad faith, and "has described a lack of good faith as 'malicious intent, capricious action or corrupt conduct,'" "wanton or malicious conduct," or "a reckless indifference to the common dictates of humanity."  *Odom*, 760 N.W.2d at 225 (quoting *Veldman v. Grand Rapids*, 265 N.W.

790, 794 (Mich. 1934)). Further, while Michigan law prohibits indemnification of a corporate director who "intentionally committed a criminal act," it does not prohibit indemnification in cases of negligent wrongdoing, and WTC's bylaws expressly require indemnification "to the fullest extent permitted by and in accordance with" Michigan law. Mich. Comp. Laws § 450.1564a(5); WTC Bylaws art. 8 § 2.

While Defendants correctly point out that Onstott's act that caused the accident (that is, speeding through a stop sign) was illegal, Onstott was convicted of strict-liability moving violations that did not require any finding of intent, criminal or otherwise. *See* Mich. Comp. Laws § 257.601d. Specifically, the statutory provisions under which Onstott was convicted prohibit any "moving violation" that "causes the death of another" or that "causes serious impairment of a body function," where moving violation is defined so as to include any "act or omission" prohibited by either the Michigan Vehicle Code or a corresponding local ordinance that "involves the operation of a motor vehicle, and for which a fine may be assessed." *Ibid.* Thus, the fact of Onstott's conviction is insufficient to show that Onstott was not acting in good faith. Nor did Defendants present other evidence of Onstott's malicious intent that would justify denying indemnification. Thus, the district court was right to hold that Onstott was acting in good faith at the time of the accident.

Further, with regard to the "best interests" part of the good-faith-and-best-interests standard, the district court correctly held that the question is not, as Defendants argued, whether Onstott's *negligence* was in WTC's best interests, but rather whether his *driving* to interview a prospective WTC employee was in WTC's best interests—and it was, in light of the fact that Onstott was traveling at the request of WTC.

Finally, to adopt Defendants' reading of the indemnification statute and to prohibit indemnification outright in cases of the indemnitee's negligence would all but render the statute toothless: as Home-Owners argues, "indemnity would be available only when there was no negligence, and thus no liability!" Thus, in light of the fact that WTC expressly adopted a mandatory-indemnification provision that extends to the "fullest extent" allowed by the MBCA, and because Michigan law does not prohibit indemnification of negligent indemnitees, the district court was correct to hold that Onstott was entitled to indemnification under WTC's bylaws.

*Issue Three: Priority*

The third issue is the priority dispute. The parties agree that the Allied commercial auto policy covers "liability for damages . . . [a]ssumed in a contract or agreement that is an insured contract." The term "insured contract" includes, among other things, any "part of any other contract . . . under which [WTC] assume[s] the tort liability of another to pay for bodily injury or property damage to a third party or organization." Under Michigan law, the WTC bylaws are a contract between Onstott and WTC. *Allied Supermarkets, Inc. v. Gracer's Dairy Co.*, 206 N.W.2d 490, 493 (Mich. Ct. App. 1973) ("The bylaws of a corporation, so long as adopted in conformity with state law, constitute a binding contract between the corporation and its shareholders.") (citing *Cole v. S. Mich. Fruit Ass'n*, 245 N.W. 534, 536 (Mich. 1932)). Thus, under the plain text of the commercial auto policy, WTC's agreement to indemnify Onstott is an "insured contract."

Further, classifying the indemnity agreement as an insured contract, which is covered under an exception to an exclusion to the general policy coverage, does not run counter to the general text and purpose of the policy, which covers damages "resulting from" WTC's "use of a

covered auto." Because covered autos include all autos and thus Onstott's auto, and because the liability in this case is stipulated to arise in the course of Onstott's use of the car *at the request of WTC*, it does not stretch the text of the policy to classify the liability here as arising from WTC's use of a covered auto.

Finally, the "general conditions" in Allied's commercial auto policy make clear that the policy provides primary coverage rather than excess coverage that would only be collectible after the exhaustion of the Home-Owners policies:

> 5. Other insurance
>> a. For any covered auto you own[,] this coverage form[3] provides primary insurance. For any covered auto you don't own[,] the insurance provided by this coverage form is excess over any other collectible insurance.
>> . . .
>> c. *Regardless of the provisions of paragraph a. above this coverage form's Liability Coverage is primary for any liability assumed under an insured contract.*

(emphasis added). Although paragraph 5.a on its own would act to prevent the commercial auto policy from providing primary coverage for Onstott's auto, paragraph 5.c overrides paragraph 5.a such that the policy *does* provide primary coverage for liability from WTC's indemnification agreement, because that agreement is an insured contract. Moreover, because the AMCO commercial umbrella policy provides excess follow-form coverage that applies when and on the same terms with which the Allied policy applies, the AMCO policy's $10,000,000 of coverage also applies to WTC's insured contracts, and thus also covers WTC's indemnity liability to Onstott, subject only to the prior exhaustion of the $1,000,000 Allied policy.

Defendants argued below and still argue on appeal that Onstott was by definition an insured only under the Home-Owners policies and is not an insured under any of Defendants'

---

[3] A "coverage form" is a standardized insurance policy.

policies, and that the Home-Owners policies should therefore take priority over Defendants' policies. That argument misses the point, however: because WTC owes indemnity to Onstott, it does not matter whether Onstott is named or implied as an insured under Defendants' policies. What matters instead is that the liability for the accident passes to WTC, and, as is clear from paragraph 5.c quoted above, this liability is then subject to primary coverage from Defendants' policies by virtue of the fact that *WTC*, not Onstott, is Defendants' insured. And, because Defendants' policies provide $11,000,000 in coverage and the parties have stipulated that the Bremer and Kleinheksel settlements do not exceed $11,000,000, we need not decide whether the Home-Owners policies might arguably provide excess coverage for WTC beyond $11,000,000.

III

In sum, we hold that Home-Owners rightly stands in Onstott's shoes to seek access to Defendants' insurance coverage, that the liability for the accident falls on WTC because WTC agreed to indemnify Onstott, and that this liability is covered in full by Defendants' policies because Defendants agreed to provide primary coverage for WTC's insured contracts. Accordingly, the district court's judgment is AFFIRMED.