PEOPLE v DOWNES

Docket No. 55308. Argued November 5, 1974 (Calendar No. 13).—
    Decided April 29, 1975.

George O. Downes, a physician in general practice, was convicted
    by a jury in the Recorder's Court of Detroit, Geraldine Bledsoe
    Ford, J., of violation of the Uniform Narcotic Drug Act (MCLA
    335.57; MSA 18.1077) in prescribing narcotic drugs for persons
    known to him to be narcotics users and addicts, otherwise than
    in good faith and in the course of his professional practice. The
    Court of Appeals, V. J. Brennan, P. J., and T. M. Burns and
    Adams, JJ., affirmed (Docket No. 12935). Defendant appeals.
    *Held:*

    1. The "good faith" standard of the statute under which
    defendant was convicted is not unconstitutionally vague.

    2. "Good faith" as used in the statute necessarily imports a
    subjective standard, measuring the honest belief and intention
    of the defendant, and not an objective standard determined by
    evaluation of the defendant's conduct in the light of proper
    professional standards.

    3. The trial court erred in failing to instruct the jury clearly
    that good faith in the course of defendant's professional prac-
    tice is subjective good faith looking to the state of mind and
    intentions of the defendant, and giving instead an instruction
    which was a confusing blend of subjective and objective stan-
    dards.

    Reversed and remanded for new trial.

    49 Mich App 532; 212 NW2d 314 (1973) reversed.

1. DRUGS AND NARCOTICS—UNIFORM NARCOTIC DRUG ACT—INSTRUC-
        TIONS TO JURY—"GOOD FAITH"—NEW TRIAL.

    A conviction of violation of the Uniform Narcotic Drug Act,
    which allowed a physician to prescribe narcotic drugs in good
    faith and in the course of his professional practice only, is
    reversed and the case is remanded for a new trial where the

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 5, 6] 25 Am Jur 2d, Drugs, Narcotics, and Poisons § 23.
[3, 7] 21 Am Jur 2d, Criminal Law §§ 13, 17.
[4] 73 Am Jur 2d, Statutes § 254.

jury was improperly instructed on the statutory meaning of "good faith" (MCLA 335.57).

2. DRUGS AND NARCOTICS—UNIFORM NARCOTIC DRUG ACT—"GOOD FAITH".

The term "good faith" as used in the Uniform Narcotic Drug Act, which allowed a physician to prescribe narcotic drugs in "good faith" and in the course of his professional practice only, necessarily imports a subjective standard (MCLA 335.57).

3. CRIMINAL LAW—"GOOD FAITH"—STATUTES—CONSTRUCTION.

"Good faith" consistently has been a standard measuring the state of mind and perception of the defendant—a measure of honest belief and intention.

4. STATUTES—CONSTRUCTION—CONSTITUTIONAL LAW.

Clear construction upholding the validity of a statute is to be favored over construction making it unconstitutional.

5. DRUGS AND NARCOTICS—UNIFORM NARCOTIC DRUG ACT—"GOOD FAITH"—CONSTITUTIONAL LAW.

The import of "good faith in the course of his professional practice" as those terms are used in the Uniform Narcotic Drug Act, which allowed a physician to prescribe narcotic drugs in good faith and in the course of his professional practice only, is to focus on the state of mind of the defendant; the statutory prescription is not unconstitutionally vague (MCLA 335.57).

6. DRUGS AND NARCOTICS—UNIFORM NARCOTIC DRUG ACT—"GOOD FAITH"—INSTRUCTIONS TO JURY.

Instructions to the jury, in a prosecution against a physician under the Uniform Narcotic Drug Act for prescribing narcotics otherwise than in "good faith" and in the course of his professional practice, which were a confusing blend of the subjective and objective standards of good faith and did not focus clearly on the state of mind and intentions of the defendant as the measure of good faith, were reversibly erroneous because they permitted the jury to convict upon the conclusion that defendant's conduct did not measure up to professional standards, without regard to his state of mind (MCLA 335.57).

7. CRIMINAL LAW—EVIDENCE—"GOOD FAITH"—EXPERT TESTIMONY.

Objective indicia of good faith are necessary in a criminal prosecution for professional misconduct involving a subjective good-faith standard because a defendant's state of mind will always be evidenced by objective indicia, and expert testimony as to

professional standards may, when measured against the defend-
ant's conduct, indicate that a particular state of mind moti-
vated him.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Patricia J. Boyle,* Principal
Attorney, Research, Training and Appeals, and
*Ronald Weitzman,* Assistant Prosecuting Attorney,
for the people.

*Samuel W. Barr, P. C.,* for defendant.

J. W. FITZGERALD, J. Defendant, a physician in
general practice, was charged with violation of § 7
of the Uniform Narcotic Drug Act, 1937 PA 343 as
amended,[1] in prescribing certain narcotic drugs by
written prescription for certain persons known to
him to be narcotics users and addicts, otherwise
than in "good faith and in the course of his
professional practice". He was convicted by jury
verdict. His conviction was affirmed by the Court
of Appeals. Concluding that the jury was improp-
erly instructed on the statutory meaning of "good
faith", we reverse and remand for new trial.

## Case History

Testimony at trial indicated that in August of
1966 two police officers on separate occasions in-
formed defendant that his practice of prescribing
significant quantities of narcotic drugs to known
users and addicts violated both the standards of
professional practice as set out by the American
Medical Association and Federal law. On both
occasions, defendant acknowledged that the pre-

---

[1] This act, formerly appearing as MCLA 335.51 *et seq.;* MSA
18.1071 *et seq.,* has been superseded by the Controlled Substances Act
of 1971, 1971 PA 196, MCLA 335.301 *et seq.;* MSA 18.1070(1) *et seq.*

scriptions to which the officers made reference had in fact been issued by him.

Defendant continued his practice of prescribing significant quantities of narcotic drugs.[2] During the first half of 1967 defendant prescribed narcotic drugs on numerous occasions to known addicts Mario Divita, Shirley Davies, Peter Giordino, Robert Krueger and Louis Nebulone.

The people introduced the testimony of expert witness Dr. Irvin Kurtz,[3] who testified that the ordinary physician (i.e., defendant) was not qualified to treat drug-dependent persons and that the treatment of drug-dependent persons "is entirely relegated to specialized institutions or specialized physicians who are so designated, recognized and known". He indicated that maintenance of a drug dosage was permissible only for a number of days, and then only if other treatment was contemplated.

The testimony of Dr. Kurtz was contradicted by testimony of two defense expert witnesses. Dr. Elliott Luby[4] testified that there were enormous numbers of drug-dependent persons in the Detroit metropolitan area, that there were not nearly enough beds to take care of everyone and that it was not necessarily so that a physician who does not have the necessary psychiatric training should

---

[2] Testimony at trial indicated that defendant prescribed significant quantities of dilaudid, cocaine, morphine sulfate and numorphan.

[3] Doctor Kurtz' qualifications indicated that he was a practicing physician and surgeon for more than 30 years. He was chief of surgery at Redford Community Hospital. While he did not treat drug-dependent persons during the regular course of his practice, he was a member and former past president of the State Board of Registration of Medicine which, on occasion, dealt with problems of the medical treatment of drug-dependent persons.

[4] Doctor Luby's qualifications indicated that since 1954 he was a physician specializing in psychiatry practicing at the Lafayette Clinic in Detroit, an institution which routinely treats drug-dependent persons.

not treat the patient. He stated that a general practitioner might not be able to obtain admission of a drug-dependent person into a "recognized" facility and then he would be faced with a dilemma:

"So the doctor, recognizing the discomfort of both patient and his family, is faced with a moral dilemma. And this is essentially a moral dilemma: shall I do something for the patient and indeed face whatever problem might occur such as those which Dr. Downes [the defendant] is currently experiencing, or shall I tell the patient and his family to leave? I can't treat you. And place them really back in the community, providing them with no help whatsoever.

"It is a dilemma which many doctors face today. And, indeed, some of them handle it by refusing treatment completely. Others, by doing whatever they can for the patient in their own particular way."

Dr. Luby was also asked whether it would be "bad faith for a doctor to give a drug-dependent person a prescription for an amount of drugs which might last for a week or two". He answered "No". The general thrust of Dr. Luby's testimony was to indicate that the defendant had issued the prescriptions not in bad faith but rather to manage drug dependence as best as it could be managed under the circumstances.

Dr. Thomas Sullivan,[5] who familiarized himself with defendant's treatment of the patients he was charged with improperly treating, testified that defendant's actions were "directed toward a cure" and added that he was not really maintaining the addicts on narcotics. The dosages of narcotics he

---

[5] Doctor Sullivan's qualifications indicated that he was a trained psychiatrist practicing since 1963 at the Lafayette Clinic and at the time held the title of head of Community Psychiatry, which involved control of drug abuse programs.

gave were preparatory to withdrawal and therefore defendant's treatment was consonant with the standards set forth by the American Medical Association. Dr. Sullivan testified that the defendant "could * * * honestly believe * * * in good faith and in sincerity that in accordance with his professional practice that the prescriptions he issued complied with good medical practice in this community for general practitioners".

Dr. George Downes, the defendant, testified on his own behalf, indicating that his actions in prescribing narcotics were taken in good faith in the course of his professional practice and directed toward a cure.

The case was submitted to the jury upon instructions and defendant's conviction resulted. The Court of Appeals affirmed. 49 Mich App 532; 212 NW2d 314 (1973). We granted leave to appeal. *People v Downes,* 391 Mich 786 (1974).

On appeal defendant raises seven issues. We will discuss only the two issues which we deem determinative of the outcome. These critical issues are:

(1) Is the "good faith" standard of § 7 of the Uniform Narcotic Drug Act, the statute under which defendant was charged and convicted, unconstitutionally vague, thereby violating defendant's right to due process under the law?

(2) Did the trial court err in failing to clearly instruct the jury, as requested by defendant, that "good faith in the course of his professional practice", as those terms were employed in § 7 of the Uniform Narcotic Drug Act, was "good faith" according to fair or reasonable medical standards *as understood by the defendant?*

I

Section 7 of the Uniform Narcotic Drug Act states, in pertinent part:

"(1) A physician or a dentist, in *good faith* and in the course of his professional practice only, may prescribe, administer, and dispense narcotic drugs, or he may cause the same to be administered by a nurse or interne under his direction and supervision." (Emphasis supplied.)

Section 20 of the Act provides:

"Any person duly licensed under the preceding provisions of this act who violates any provision of this act shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 10 years or by a fine of not more than $10,000.00 or by both such fine and imprisonment."

Following conviction by jury under the first section for failure to prescribe narcotic drugs in good faith and in the course of his professional practice, defendant was sentenced to five years probation with payment of a fine of $5,000.

Defendant contends that the term "good faith" as used in the statute is hopelessly vague and indefinite, pointing out that it is unclear whether the term as employed was intended to mean honesty in fact, a subjective standard, or "good faith" determined by evaluation of defendant's conduct in light of proper professional standards, an objective standard. Framed in this manner, defendant's contention directly relates to the discussion in part II of this opinion.

In support of this argument we are referred to numerous general authorities indicating that conviction under a vague criminal statute violates due process of law. A sampling of these references are here set forth:

" 'That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who

are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' *Connally v General Construction Co,* 269 U.S. 385, 391 (46 Sup. Ct. Rep. 126, 70 L. Ed. 322) [1926].

" 'But, in order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty.' *Tozer v United States,* 52 Fed. 917." *People v Austin,* 301 Mich 456, 463–464; 3 NW2d 841 (1942).

"A criminal statute must be definite as to the persons within the scope of the statute and the acts which are penalized. If it is not definite, the due process clause of state constitutions and of the Fifth and Fourteenth Amendments of the Federal Constitution, whichever is applicable, is violated.

"If the statute is so vague and uncertain that a reasonable man would be compelled to speculate at his peril whether the statute permits or prohibits the act he contemplates committing, the statute is unconstitutional. The legislature, in the exercise of its power to declare what shall constitute a crime or punishable offense, must inform the citizen with reasonable precision what acts it intends to prohibit, so that he may have a certain understandable rule of conduct. If on its face a criminal statute is repugnant to the due process clause, specifications of details of the offense intended to be charged will not serve to validate it, it being the statute and not the accusation under it that prescribes the rule to govern conduct and warns against transgression." 1 Wharton's Criminal Law and Procedure, § 18, p 32.'

Commentary mirroring the above may be found on many pages of our now-voluminous collection of

Michigan Reports. On one such page the issue defendant raises prompted this Court to make the following comment:

"A criminal statute ought to be so plain and unambiguous that 'he who runs' may read, and understand whether his conduct is in violation of its provisions." *People v Ellis,* 204 Mich 157, 161; 169 NW 930 (1918).

We have no quarrel with the general proposition defendant sets forth. Such difficulties for defendant as here arise do so in application of the principle to the statutory language under consideration.

The Uniform Narcotic Drug Act for many years has been law in a substantial number of states. Although no case defining or treating "good faith" as that term is used in § 7 of the uniform act has arisen in Michigan, courts in other jurisdictions have reviewed this precise language in the face of an argument that the language is unconstitutionally vague. In *Smith v State,* 214 Ind 169; 13 NE2d 565 (1938), the Indiana Supreme Court rejected defendant's implicit contention that "good faith" language of the statute was vague, commenting that:

"[G]ood faith means 'good intentions and the honest exercise of his best judgment as to the need of [defendant doctor's] patient';" and
" 'Good faith' needs no definition other than that implied by the words themselves." 214 Ind 169, 174; 13 NE2d 562, 565.

This contention was likewise rejected in *People v Guagliata,* 362 Ill 427; 200 NE 169; 103 ALR 1035 (1936), with the Illinois Supreme Court concluding that "good faith" means "honest, lawful intent"

and as used in the statute has "a definite and well-understood meaning * * * free from ambiguity * * * ". *Supra,* 432.

"Good faith" as employed in a statute similar to that here considered (but not framed in the precise language of the uniform act) was found to have a "well-defined and generally understood meaning" and was determined to be inoffensive to constitutional due process by the California Supreme Court in *People v Nunn,* 46 Cal 2d 460; 296 P2d 813 (1956).

In resolving the question at hand we confront defendant's contention that "good faith" as used in the statute may import both a "subjective" and "objective" standard. We disagree with defendant's construction, concluding that "good faith" as used in this criminal statute necessarily imports a subjective standard.

"Good faith" consistently has been deemed a standard measuring the state of mind and perception of the defendant—a measure of honest belief and intention. See, *e.g., People v Averill,* 179 Mich 224; 146 NW 189 (1914); and *People v Rice,* 161 Mich 657; 126 NW 981 (1910). The Oxford English Dictionary, Vol 5, p 32, defines good faith as: "honesty of intention in entering into engagements". Even the Uniform Commercial Code, operating in a commercial law context, defines "good faith" generally as "honesty in fact in the conduct or transaction concerned". MCLA 440.1201(19); MSA 19.1201(19).[6] The interjection of the modifying terms "in the course of his professional prac-

---

[6] The Code departs from such general definition in Article 2 on sales, defining "good faith" in the case of a merchant to be "honesty in fact *and the observance of reasonable commercial standards of fair dealing in the trade". See* MCLA 440.2103(1)(b); MSA 19.2103(1)(b). The choice of language in this instance contrasts markedly with the choice of the language in § 7 of the Uniform Narcotic Drug Act.

tice" into the statutory formulation does not change the obvious and clear import of "good faith" in the absence of express manifestation of legislative intention indicating such change. Moreover, to construe the statute as defendant would have us construe it would be to acknowledge that the statute may measure criminality by lack of conformity to professional standards which are not set forth in cognizable form in the statute itself. The source of such standards is unclear and, indeed, the standard of "proper" professional conduct is the subject of considerable dispute within the profession, as attested by the disparate medical expert testimony on this record. Such a construction would necessarily require a finding of unconstitutionality.

Clear construction upholding the validity of a statute is to be favored over unconstitutional construction. *People v Babcock,* 343 Mich 671; 73 NW2d 521 (1955); *People v Padgett,* 306 Mich 545; 11 NW2d 235 (1943); and *People v Dubina,* 304 Mich 363; 8 NW2d 99; 145 ALR 886 (1943). This observation but confirms our conclusion that the unmistakable import of "good faith in the course of his professional practice" as those terms are used in the statute is to focus on the state of mind of the defendant. We do not find the statutory prescription unconstitutionally vague. Accord: *Smith, supra,* and *Guagliata, supra.*

## II

Pursuant to its theory the defense, prior to the court's rendering of instructions, tendered to the court a request to charge respecting the definition of good faith. The request appears to have been based upon certain language from *United States v Anthony,* 15 F Supp 553 (SD Cal, 1936), indicating

(at 559) that "good faith" meant that a physician in prescribing narcotics "must act with honest belief, *based upon his medical knowledge,* that the case reasonably requires such treatment" and that the appropriate standard was "good faith according to fair or reasonable medical standards *as understood by him"*. (Emphasis supplied.)[7]

Defendant's request was modified by the trial court and the jury was ultimately instructed as follows:

"Now the third element of this offense is that the defendant in the course of his professional practice dispensed or prescribed the narcotic drugs to patients not in good faith. Now, the principal element, then, with which you will be involved in your deliberation is the element of good faith or a lack of good faith. Did the defendant act in good faith or in bad faith in prescribing the narcotics to his patients?

*"Good faith means intention and an honest exercise of his, the physician's, best judgment as to the needs of the patient.* If you should find that the defendant made erroneous judgment in prescribing for his patients or that the results of his practice were not favorable, that would not alone be sufficient to convict him. You must find beyond a reasonable doubt in order to convict the defendant that he acted improperly and in bad faith and not according to accepted medical standards for general practitioners in the prescribing of narcotic drugs to his patients.

"Now, the law, of course, does not prohibit a physician from prescribing to an addict for self-administration or for the purpose of relieving conditions, mental or physical, which may be the product of addiction to narcotics or conditions—physical conditions or mental conditions caused by other factors such reasonable

---

[7] While *United States v Anthony* did not consider statutory language identical to the language of the uniform act here considered, the import of the pertinent Federal enactment as construed in *Anthony* is identical to the import of § 7 of the uniform act. See I of this opinion.

amounts, one dose or a number of doses of narcotics, as fair medical standards recommend. In doing this, the physician must act with honest belief, *based upon accepted medical standards that the case of his patient reasonably requires such treatment.* A physician is not to be held accountable for mere error of judgment in such a case. Nor is he to be criminally responsible merely because the results are not as favorable as he expected or anticipated. The physician's responsibility is different. He will not *[sic]* be held criminally accountable under the law if he, not using his best medical judgment in determining that the patient is in need of treatment, issues prescriptions at the request of an addict merely to furnish such a supply of drugs as the addict desires, *or if he acts contrary to accepted medical standards for general practitioners.*

"In determining whether a physician has acted in good faith in prescribing narcotics for a patient, you are to consider what the accepted opinion of the medical profession is upon that point. If reputable physicians honestly hold two opinions; some justifying the administration of narcotics in the manner and in the quantity shown to have been administered by Dr. Downes to the subjects named in the information, and the other is honestly opposed to that opinion, and if the defendant held honestly to the opinion shown to be that of one group of reputable medical practitioners and in good faith acted accordingly, he would not be guilty.

"You have that question, of course, to decide. And you are required to make up your judgment on all of the evidence submitted to you on that point. Good faith on the part of the accused is an important element in the offense charged. *Good faith, according to reasonable medical standards.* That is, if you find that the defendant used good faith, then he would not be guilty. If you find in considering all of the evidence that he did not use good faith, that he acted in bad faith, then it would of course be your duty to convict him. But, of course, it is not simply bad judgment which is held to be criminal action. But bad faith."[8] (Emphasis supplied.)

---

[8] The trial court in this case, significantly, did not give an instruction such as the following drawn from the language in *Anthony, supra:*

"If you have a reasonable doubt as to what fair medical practice

At the close of instructions the following collo-
quy took place between counsel and the court:

"*[The Court]:* Are there any misstatements or omis-
sions to which you would · want to call the court's
attention, Mr. Mandlebaum [prosecuting attorney], Mr.
Sherman [defense attorney], Mr. Barr [defense attor-
ney]?

"(Separate record out of the presence of the jury.)

"*Mr. Sherman:* We do accept *[sic]* to your Honor's
failure to give our request of charge.

"*Mr. Barr:* In that you said upon accepted medical
standards instead of upon his medical knowledge. You
substituted the word.

"*The Court:* I did do that deliberately. And I thought
about it. And what I thought was do you do it according
to what you think is best or do you do it according to
what are the—

"*Mr. Sherman (Interposing):* As long as you honestly
feel in your own mind. It is a state of mind.

"*Mr. Barr:* This whole case is on a state of mind.

"*The Court:* I would say when you are talking about
good faith and bad faith, it also has to do to me with
what you are up and about and doing and finding out.
And if you are a doctor, it just seems to me you ought
to know the things that people generally know.

"*Mr. Sherman:* But suppose I stupidly give—I think I
am giving—

*    *    *

"*Mr. Barr:* You left that out in two places. You left
that out on the second page and you left it out on the
first page, his medical knowledge—

"*The Court (Interposing):* Tell me what page it is.

---

would require in the cases treated by the defendant, but find that the
defendant believed that he was acting according to good medical
standards, he would be entitled to an acquittal. The purpose of the
law; in making the exception as to practicing and registering physi-
cians, is to allow the medical profession the right to prescribe such
narcotic drugs as the necessary needs of their patients in their honest
judgment require.

"What the law punishes is *not bad judgment* in a physician, *but
bad faith."* (Emphasis by the Court.)

"*Mr. Barr:* Seventh line down. You changed the word 'his' to accepted. And you added the word 'standard—medical standard' instead of his medical knowledge. You put accepted medical standard. And, then, page—the fifth line down, you left out the word 'fair' in that as understood by him. You left that out, too. According to reasonable medical standards. And you didn't put in there as understood by him.

"*The Court:* Well, I did take those out.

"What do you think, Mr. Mandlebaum; or do you have any thoughts on the premises?

"I am just not sure you are a good faith doctor if you go around thinking on your own head and you don't bother to make solid determinations.

"*Mr. Sherman:* That is an argument to show he didn't honestly think that is wrong. It is an argument I think that the prosecutor used rather effectively saying good faith, he didn't bother. But if the jury has a reasonable doubt as to whether or not he had good faith—

"*The Court (Interposing):* See, to me—let's assume that you are not a heart specialist and you cut somebody's heart out. And you say you are going to put a new heart in. And you say, 'I really thought I was doing the right thing.' That doesn't seem to be good faith to me.

"*Mr. Sherman:* I think, Judge, that is the law. You might say, Judge, he is full of wet hay. He didn't do a damned thing. And that shows he didn't act in good faith. But I think the test of good faith is—

"*Mr. Mandlebaum (Interposing):* Your Honor, when you say—I think good faith certainly does go to the intention of a defendant. But, also, the medical standard to the community has to be taken into consideration. Otherwise, we have a situation where the defendant determines what the law is.

"*The Court:* Well, I think I will just let it go at that."

Defendant, through his counsel at trial, attempted to object to the instructions on the ground that they did not define "good faith" in such a way

as to clearly focus on the state of mind and intentions of the defendant. What the trial court here "let go" was an instruction which was a confusing blend of what we have in section I of this opinion termed "objective" and "subjective" conceptions of good faith. "Good faith" in § 7 of the Uniform Narcotic Drug Act, the statute under which defendant was charged, is subjective good faith looking to the state of mind and intentions of the defendant. See I of this opinion.

The trial court's instructions must be viewed in the context of what was in many respects a trial by expert testimony. Under these instructions defendant's conviction may have resulted because the jury, without regard for or focus upon defendant's state of mind, concluded that defendant's conduct did not measure up to professional standards. The following closing comments recently made by this Court in reversing and remanding for new trial on the ground of instructional error in *People v St Cyr*, 392 Mich 605, 612; 221 NW2d 389 (1974), appropriately sum up the effect of instructional error in this case.

"Fair jury consideration of defendant's guilt or innocence under the law was [by the instructional error complained of] rendered impossible. The result was a miscarriage of justice."

See, *e.g., People v Liggett*, 378 Mich 706; 148 NW2d 784 (1967); MCLA 769.26; MSA 28.1096 and other authorities cited in *St Cyr*.

In concluding, as we do, that the instructions given the jury in this case were fatally and, indeed, reversibly defective, we do not mean to suggest that expert testimony as to professional standards has no place in criminal proceedings involving a subjective good-faith standard. Objec-

tive indicia of good faith are necessary in a proceeding involving subjective good faith, for a defendant's state of mind will always be evidenced by objective indicia. The focus, however, must be upon objective indicia *as they pertain to defendant's animus.* It may be that evidence of professional standards, when measured against defendant's conduct, will, with considerable probative force, indicate that a particular state of mind motivated defendant. This is not to say, however, that guilt or innocence under a criminal statute such as that here involved may be determined alone by measurement of defendant's conduct against professional standards. The instructional focus under such law must always be upon defendant's state of mind.

Reversed and remanded for new trial.

T. G. KAVANAGH, C. J., and SWAINSON, WILLIAMS, LEVIN, and M. S. COLEMAN, JJ., concurred with J. W. FITZGERALD, J.

The late Justice T. M. KAVANAGH took no part in the decision of this case.