HOME–OWNERS INSURANCE
COMPANY, Plaintiff/Counter–
Defendant,

v.

ALLIED PROPERTY AND CASUALTY
INSURANCE COMPANY and AMCO
Insurance        Company,        Defen-

dants/Counter–Claimants.

Case No. 1:14–cv–467

United States District Court,
W.D. Michigan, Southern Division.

Signed January 26, 2016

Curtis Hadley, Frederick Milton Baker, Jr., Willingham & Cote PC, East Lansing, MI, for Plaintiff/Counter–Defendant.

Philip E. Kalamaros, Hunt Suedhoff Kalamaros LLP, St. Joseph, MI, for Defendants/Counter–Claimants.

## OPINION AND ORDER

JANET T. NEFF, United States District Judge

Plaintiff Home–Owners Insurance Company (Home–Owners) filed this suit, seeking a declaratory judgment that Defendants Allied Property and Casualty Insurance Company (Allied) and AMCO Insurance Company (AMCO) have the primary coverage obligation for claims arising from a motor vehicle accident. Defendants removed the diversity action to this Court. Now pending before the

Court are the parties' cross-motions for summary judgment (Dkts. 59 & 61). Having considered the parties' written briefs, stipulated statement of facts and accompanying exhibits, and having had the benefit of oral argument, the Court concludes that Home–Owners is properly granted summary judgment, and Defendants' motion is properly denied.

## I. BACKGROUND

This case arises from a July 30, 2013 motor vehicle accident (SMF[1] ¶ 1). It is undisputed that on that date, Jason Onstott's vehicle collided with the vehicle driven by Glenn Alan Kleinheksel, resulting in serious injuries to Kleinheksel and the death of Kleinheksel's passenger, David J. Bremer (*id.* ¶¶ 1, 13). Onstott owned the vehicle that he was driving during the accident (*id.* ¶ 2). Plaintiff Home–Owners insured the accident vehicle under an auto policy and Onstott under a personal umbrella policy. The auto policy afforded $500,000 liability coverage for the accident vehicle (*id.* ¶¶ 20–21). The auto policy also provided that "[i]f [Home–Owners] make[s] a payment under this policy and the person to or for whom payment is made has a right to recover damages from another, we will be entitled to that right" (Pl.'s Ex. A, § V(3)(a), Dkt 59–2 at PageID.1072). The personal umbrella policy, which afforded $1 million in coverage (SMF ¶ 20, 24), provided that "[i]f other insurance covering a loss also covered by this policy is available to the insured, the insurance afforded by this policy shall be excess of such other insurance" (Pl.'s Ex. B, Conditions, Dkt 59–3 at PageID.296).

At the time of the accident, Onstott was a shareholder, officer or director and employee of Western Tel–Com (WTC) (SMF ¶ 3). Onstott, acting in the course of his employment, was on his way to attend an interview with a prospective WTC employee (*id.* ¶ 4). WTC was insured under two pertinent policies. The first policy, Defendant Allied's business auto policy, afforded $1 million in coverage and defined "covered autos" to include "any Auto" (*id.* ¶¶ 28–30). WTC's Allied business auto policy excluded from the definition of "insured" a "[WTC] employee if the covered auto is owned by that employee or a member of his or her household …" (*id.* ¶ 32). The second policy, issued by Defendant AMCO, insured WTC on the date of the accident under a $10,000,000 excess liability policy ("WTC's AMCO commercial umbrella policy") (*id.* ¶ 37). Onstott is not a named insured under WTC's AMCO commercial umbrella policy (*id.* ¶ 38).

Kleinheksel subsequently filed a lawsuit against Onstott and WTC, including a derivative claim ("the *Kleinheksel* lawsuit") (SMF ¶ 16). Marie K. Bremer, the personal representative of the Estate of David J. Bremer, also filed a lawsuit ("the *Bremer* lawsuit") (*id.* ¶ 14). Personal Representative Bremer initially named both Onstott and WTC as defendants, but she voluntarily dismissed WTC without prejudice on May 6, 2014 (*id.* ¶ 15).

Onstott and Kurt Friedriechsen, WTC's other shareholder, testified that at the time of the accident, Onstott was "acting in the course of his employment, in good faith, at the request, and in the best interests, of his employer, WTC, to attend an interview with a prospective WTC employee" (SMF ¶ 4). Onstott admitted in his November 6, 2014 deposition in the underlying lawsuits that on the day of the accident, he failed to act as a reasonably careful and prudent motor vehicle operator would have acted under the same or similar circumstances (*id.* ¶ 11). Onstott also admitted that he was speeding when he

---

1. The parties filed a "Joint Concise Statement of Material Facts" (SMF) (Dkt 58), upon which this Court relies for resolution of this motion unless otherwise indicated.

ran the stop sign and collided with the vehicle being driven by Kleinheksel with passenger Bremer (*id.*). Defense counsel posed questions during Onstott's January 5, 2015 deposition suggesting that Onstott's violation of traffic laws by driving inattentively, failing to yield and running a stop sign while talking on his cell phone—circumstances that led to the accident—precluded a finding that Onstott was acting either in good faith or in WTC's best interests when the accident occurred (*id.* ¶ 5). In response to the questions posed, Onstott testified that he did not believe that violating traffic laws, driving inattentively, running a stop sign or failing to yield the right-of-way to other automobiles were activities in WTC's best interests (*id.* ¶¶ 6–10).

Onsott pled "no contest" to, and was found guilty of, one count of a Moving Violation Causing Death and one count of a Moving Violation Causing Serious Impairment of a Bodily Function, misdemeanor offenses under MICH. COMP. LAWS § 257.601d (SMF ¶ 19). He was placed on six months' probation, spent five days in jail, and paid fines and fees (*id.*).

On February 25, 2015, Onstott wrote to WTC's Board of Directors and requested indemnification for all expenses, including attorney fees, judgments, penalties, fines and amounts paid in settlement that Onstott incurred in connection with the pending lawsuits (SMF ¶ 48). On March 9, 2015, counsel for Allied and AMCO stated in a letter to WTC that Allied and AMCO "do not consent, do not agree, and do not give Western Tel–Com permission to agree to such indemnification, expense and obligation" (*id.* ¶ 50). In the same letter, counsel for Allied and AMCO also stated:

> You are reminded that the indemnification provisions under the Business Corporation Act prohibits indemnification of Mr. Onstott for these claims because he did not have a reasonable belief that his conduct in running a stop sign and speeding and driving inattentively was in the best interests of Western Tel–Com, and he also had not [sic] reason to believe such conduct was lawful, and has so stated on July 10, 2014 and January 5, 2015.
>
> Indemnification by Western Tel–Com as requested is improper, and will violate policy terms and will adversely affect any possible coverage, if there is any.

Id. ¶ 51.

On March 10, 2015, in a letter addressed to defense counsel, WTC informed Allied and AMCO that "WTC does not contemplate making any voluntary payment for the indemnification claim; rather, it has provided notice to your clients of the existence of the claim and will look to your clients for coverage and payment of the claim pursuant to the referenced policies" (*id.* ¶ 49). In response, counsel for Allied and AMCO stated:

> It is my understanding that Jason Onstott has made a request for indemnification under the By–Laws. According to Jason Onstott's and Kurt Freidriechsen's deposition testimony, there has been no previous request for indemnification and no corporate action accepting indemnification. To my knowledge, there has been no court action requested or filed asking for an order of indemnification. I was merely making it unequivocal that my clients do not consent or agree to Western Tel–Com taking any corporate action to indemnify Jason Onstott or to agree to such indemnification.

Id. ¶ 52.

The *Bremer* lawsuit was settled and dismissed with prejudice pursuant to an agreement approved by the court that released all potentially liable parties, including Onstott, WTC, anyone else who may have been deemed to be an owner of the accident vehicle, and their respective

agents and assigns (SMF ¶ 18). The agreement in *Bremer* also "terminate[d] all further claims that [the estate of David Bremer] may have against Jason D. Onstott, his wife, Western Tel–Com or their insurance carriers" (*id.*). On April 9, 2015, the *Kleinheksel* lawsuit was likewise settled and dismissed with prejudice pursuant to a Release and Settlement Agreement that disposed of all claims arising out of the accident against Onstott, his wife, WTC and their respective insurers, successors and assigns (*id.* ¶ 17).

As of July 24, 2015, Onstott had not sued WTC for indemnification, nor had he filed suit or otherwise applied to any court to determine whether he is entitled to indemnification under WTC's bylaws for the accident (SMF ¶¶ 53–54). Further, Home–Owners had not received an assignment of any right that Onstott may have to proceed against WTC, and Home–Owners had not sued WTC based on any rights it could have secured by assignment from Onstott (*id.* ¶¶ 55–56).

Home–Owners filed a Complaint for Declaratory Judgment against Defendants on April 9, 2014, in the Circuit Court for Ingham County, Michigan (Dkt 1–1 at Page ID.22). On April 28, 2014, Defendants Allied and AMCO removed the case to this Court based on this Court's diversity jurisdiction (Dkt 1). On July 16, 2014, Home–Owners amended its complaint (Dkt 17). Defendants filed an Answer and Counter–Claim for Declaratory Judgment in their favor (Dkt 20). Following a Status Conference in June 2015, the parties proceeded with briefing Home–Owners' motion for summary judgment (Order, Dkt 55). Home–Owners filed its Motion for Summary Judgment (Dkt 59), to which Defendants Allied and AMCO filed a response and cross-motion for summary judgment in their favor (Dkt 61). Home–Owners filed a reply (Dkt 66). The Court conducted oral argument on January 26, 2016.

## II. ANALYSIS

### A. Motion Standard

A court properly grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of an issue to be litigated at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir.2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The parties do not dispute that Michigan law governs the issues on which they seek summary judgment (Dkt 59 at 8; Dkt 61 at 12). This Court applies state law in accordance with the controlling decisions of the state supreme court. *See Allstate Ins. Co. v. Thrifty Rent–A–Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir.2001) (citing *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir.1996)). If the state supreme court has not yet addressed an issue presented, then the Court

must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Id.* (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995)).

## B. Discussion

The parties' briefing presents three issues for this Court's resolution: (1) the timing of Plaintiff Home–Owner's complaint, (2) the scope of WTC's bylaw provisions on indemnification, and (3) the priorities for applying the liability insurance under their respective policies to the claims arising from the accident. The Court will examine the parties' arguments on each topic, in turn.

■ **1. *Timing*.** As a threshold matter, the Court turns to Defendants' charge that Plaintiff Home–Owners prematurely filed this declaratory judgment action. Defendants Allied and AMCO argue that Home–Owners' motion is premature inasmuch as Onstott has not filed suit or applied to a court to determine indemnification for the accident (Dkt 61 at 3, citing *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) ("The federal courts ... do not render advisory opinions.") (citation omitted)).

The Court disagrees.

■ "The declaratory judgment rule was intended to be liberally construed to provide a broad, flexible remedy to increase access to the court." *U.S. Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838, 841 (1983). "In the usual case, an actual controversy exists where a declaratory judgment is necessary to guide a litigant's future conduct in order to preserve his legal rights." *Id.* "A court is not precluded from reaching issues be-

fore actual injuries or losses have occurred." *Id.* (citing *Shavers v. Attorney Gen.*, 402 Mich. 554, 267 N.W.2d 72, 82 (1978) (opining that "what is essential to an 'actual controversy' under the Declaratory Judgment rule is that plaintiffs plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised")). *See also Grp. Ins. Co. of Mich. v. Morelli*, 111 Mich.App. 510, 314 N.W.2d 672, 675 (1981) (observing that "our literature abounds with case law where the insured or insurer has sought a declaratory action to determine disputed issues of coverage").

Here, as Home–Owners points out in Reply, (1) claims were asserted in the *Bremer* and *Kleinheksel* cases; (2) Onstott requested WTC to indemnify him; (3) WTC requested Defendants satisfy Onstott's claim; (4) Defendants refused to do so; and (5) the total indemnity amount has been liquidated and paid under agreements settling and dismissing all claims from the accident (Dkt 66 at 2–3). Accordingly, the Court determines that an "actual controversy" exists and that a declaratory judgment is necessary to guide the litigants' future conduct.

■ **2. *Indemnity*.** Second, the Court turns to Defendants' argument that the facts of this case "do not allow for indemnification" and that WTC satisfied its obligation to indemnify its officers and directors by purchasing insurance (Dkt 61 at 7–9). According to Defendants, this Court should examine WTC's bylaws in the context of the accident, specifically, that the accident occurred when Onstott was "engaged in illegal activity" (*id.* at 5).

Home–Owners rejects Defendants' argument that Onstott's negligence on July 30, 2013 forecloses his right to mandatory indemnification from WTC (Dkt 59 at 9, 15). According to Home–Owners, "[t]he line between those acts for which indemnification

is mandatory under the statutory good faith and best interest standards is not the mere negligence of which Onstott was guilty in driving inattentively and running a stop sign; rather, ... only *willful* and *intentional* conduct negating the good faith/best interest standard forecloses indemnity" (*id.* at 12, citing MICH. COMP. LAWS § 450.1564b(4)) (emphases in original). Home–Owners emphasizes that under Defendants' test, "indemnity would be available only when there was no negligence, and thus no liability!" (*id.* at 15). Home–Owners frames the relevant question as "not whether Onstott's *negligence* was in WTC's best interests, as Defendants contend, but whether the *activity* in which he engaged when the negligence occurred was in good faith and the company's best interests" (*id.* at 16) (emphases in original).

Defendants' argument lacks merit.

Michigan's Business Corporation Act (MBCA) sets forth two types of indemnification: permissive and mandatory. *See generally* "Indemnification & Ins. for Directors & Officers," MICH. CORP. LAW & PRAC. § 5.17 (2016). MBCA § 561 provides the following:

A corporation has the power to indemnify a person who was or is a party or is threatened to be made a party to a threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal, other than an action by or in the right of the corporation, by reason of the fact that he or she is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, partner, trustee, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, or other enterprise, whether for profit or not, against expenses, including attorneys' fees, judgments, penalties, fines, and amounts paid in settlement actually and reasonably incurred by him or her in connection with the action, suit, or proceeding, *if the person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation or its shareholders, and with respect to a criminal action or proceeding, if the person had no reasonable cause to believe his or her conduct was unlawful.* The termination of an action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, does not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the corporation or its shareholders, and, with respect to a criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

MICH. COMP. LAWS § 450.1561 (Indemnification; actions by third parties) (emphasis added). *See, e.g., Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.,* 426 B.R. 520, 524–25 (E.D.Pa.2010) (applying Mich. Comp. Laws § 450.1561 within the context of a bankruptcy stay and explaining that the employees were not "automatically entitled to indemnity"). Michigan law only *requires* indemnity "if a director or officer of a corporation has been successful on the merits or otherwise in defense of an action, suit, or proceeding." MICH. COMP. LAWS § 450.1563.

██ Nonetheless, "[i]t is common for corporations to adopt through their by-laws a requirement that they must (as opposed to may) reimburse directors for their costs." *Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 257 F.3d 484, 494 (6th Cir.2001) (discussing

Delaware's analogous indemnification statute, modeled on the American Bar Association's Model Business Corporation Act). Hence, Michigan's Act instructs that the indemnification provided therein "is not exclusive of other rights to which a person seeking indemnification or advancement of expenses may be entitled under the articles of incorporation, bylaws, or a contractual agreement." MICH. COMP. LAWS § 450.1565. "Where parties have expressly contracted with respect to the duty to indemnify, the extent of the duty must be determined from the language of the contract." *Grand Trunk W. R.R. v. Auto Warehousing Co.*, 262 Mich.App. 345, 686 N.W.2d 756, 763 (2004) (Neff., P.J.).

Here, as to its employees and agents, WTC provided permissive indemnification. As to its officers and directors, such as Onstott, WTC adopted a mandatory indemnification requirement. Article 8 of WTC's bylaws provides the following:

Section 1. **Definitions.** As used in this Article 8, any word or words defined in sections 561–566 of [Michigan's Business Corporation] Act (the *"Indemnification Section"*) shall have the same meaning as provided in the Indemnification Section.

Section 2. **Indemnification of Officers and Directors.** The corporation shall indemnify and advance expenses to a director or officer of the corporation in connection with a proceeding to the fullest extent permitted by and in accordance with the Indemnification Section.

Section 3. **Indemnification of Employees and Agents.** With respect to an employee or agent, other than a director or officers, of the corporation, the corporation may, as determined by the board of directors of the corporation, indemnify and advance expenses to such employee or agent in connection with a proceeding to the extent permitted by

and in accordance with the Indemnification [S]ection.

Section 4. **Insurance.** The corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee, or agent of the corporation against any expense, liability, or loss, whether or not the corporation would have the power to indemnify the person against the expenses or loss under the Act.

(Pl.'s Ex. F, WTC Bylaws, Dkt 59–7 at PageID.1144–45). Home–Owners therefore correctly observes that WTC's mandatory indemnification provision "overrides" the statutory discretion that WTC would otherwise possess to grant indemnification (Dkt 59 at 11).

The parties do not disagree that Onstott's employment with WTC necessitated his travel on July 30, 2013. *See Long v. McKay*, 295 Mich. 494, 295 N.W. 239, 239 (1940) (holding that if the work of the employer creates the necessity for the employee's travel, then the traveling employee is in the course of his employment); *TenBrink v. Mokma*, 13 Mich.App. 85, 163 N.W.2d 687, 688 (1968) (same). Further, the parties do not disagree that WTC's bylaws and the statutory indemnification provisions restrict indemnification to acts of "good faith" that are "reasonably believed to be in the best interests of the corporation" (Dkt 59 at 11; Dkt 61 at 9–10). The parties disagree as to whether the "good faith" and "best interest" requirements are met on these facts, such that indemnification would be mandated.

Again, Home–Owners argues that only "willful" and "intentional" conduct by Onstott would have negated the good faith/best interest standard and foreclosed the mandatory indemnity WTC contractually provides to officers and directors (Dkt 59 at 12). Defendants, in contrast, opine that Onstott's admissions that his negligent

conduct was not in WTC's best interests and that he knew the conduct was "illegal" are "dispositive so that Onstott does not qualify under the statute or the WTC by-laws for indemnification". (Dkt 61 at 10).

■ It is widely accepted that public policy does not permit insuring oneself against the ultimate legal consequences of "intentional" torts, or wrongs that can be characterized as "willful." *Constable v. Northglenn, LLC,* 248 P.3d 714, 718 (Colo. 2011) (citing cases therein, and 41 AM. JUR. 2d, Indemnity § 12). *See, e.g., Berger v. Katz,* No. 291663, 2011 WL 3209217 (Mich. Ct.App. July 28, 2011) (holding that indemnification was precluded where the trial court found that the defendants engaged in "willfully unfair and oppressive conduct" against the plaintiff minority shareholder); *Equitex, Inc. v. Ungar,* 60 P.3d 746, 750 (Colo.App.2002) (holding that indemnification was precluded, under either a contract or promissory estoppel theory, where the jury found that the defendant-director acted "wrongfully and intentionally" in stealing an investor's property); *Biondi v. Beekman Hill House Apartment Corp.,* 94 N.Y.2d 659, 709 N.Y.S.2d 861, 731 N.E.2d 577, 581 (N.Y.App.2000) (holding that nothing in the plaintiff's conduct could be construed as "being undertaken in good faith, for a purpose 'reasonably believed' to be in the best interests of [the defendant]" where the plaintiff intentionally denied a sublease application on the basis of race and "knowingly exposed" the defendant to liability under the civil rights laws). *See also In re Landmark Land Co.,* 76 F.3d 553, 565 (4th Cir.1996) ("An agent who has intentionally participated in illegal activity or wrongful conduct against third persons cannot be said to have acted in good faith, even if the conduct benefits the corporation.").

"With regard to acts of simple negligence, however, it is widely held to be socially beneficial to permit the allocation of costs and mitigation of risk through indemnity agreements, liability insurance, or otherwise." *Constable,* 248 P.3d at 718 (citing 57A AM. JUR.2d Negligence § 48 (2d ed.2004)). "The policy considerations behind these statutes are that persons who serve the corporation in good faith should, in the absence of certain conduct (fraud, breach of fiduciary duties, etc.) be free from liability for corporate acts." *Plate v. Sun–Diamond Growers,* 225 Cal.App.3d 1115, 1122–23, 275 Cal.Rptr. 667 (1990).

■ The Michigan supreme court has observed that " 'good faith' needs no definition other than that implied by the words themselves" and that "good faith means 'good intentions and the honest exercise of [a person's] best judgment.' " *People v. Downes,* 394 Mich. 17, 228 N.W.2d 212, 216–17 (1975) (interpreting a statute authorizing a physician in good faith to prescribe and dispense narcotic drugs) (citation omitted). *See also Shaffner v. Riverview,* 154 Mich.App. 514, 397 N.W.2d 835, 837 (1986) (adopting the *Downes* definition of "good faith" in the context of a contribution statute); *Miller v. Riverwood Recreation Ctr., Inc.,* 215 Mich.App. 561, 546 N.W.2d 684, 689 (1996) (noting that Black's Law Dictionary (6th ed.) "defines 'good faith' in part,' as 'an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage.' "). Conversely, the Michigan supreme court has also described a "lack of good faith" as "malicious intent, capricious action or corrupt conduct or willful and corrupt misconduct." *Odom v. Wayne Cty.,* 482 Mich. 459, 760 N.W.2d 217, 225 (2008) (citing cases therein). Accordingly, "a judgment against the director, standing alone, may not be dispositive of whether the director acted in good faith." *Biondi,* 709 N.Y.S.2d 861, 731 N.E.2d at 580–81. Similarly, "a party's liability for a tort against a third

person is not necessarily inconsistent with good faith." *Equitex,* 60 P.3d at 751.

The Michigan statutory provision under which Onstott was convicted, MICH. COMP. LAWS § 257.601d, is "silent with regard to fault or intent." *People v. Pace,* 311 Mich. App. 1, 874 N.W.2d 164 (2015) appeal denied, No. 152070, 498 Mich. 957, 872 N.W.2d 497, 2015 WL 9461336 (Mich. Dec. 23, 2015). The Michigan court of appeals held that the commission of a moving violation indicates that the motorist failed to exercise ordinary and reasonable care and caution, "regardless of intent." *Id. Cf. People v. Jones,* 497 Mich. 155, 860 N.W.2d 112, 122 n.45 (2014) (explaining that the felony offense of reckless driving, in contrast, requires the prosecution to prove that a defendant acted "in willful or wanton disregard for the safety of persons or property"); MICH. COMP. LAWS § 257.626 (Reckless Driving).

Accordingly, the Court determines that Onstott's conduct cannot be properly construed as willful or intentional conduct or inconsistent with good faith. The Court therefore agrees with Home–Owners that the scope of WTC's bylaws encompasses indemnification for the damages incurred on July 30, 2013, while Onstott was performing a duty within the scope of his employment.

**3.** *Insurance.* The last matter for the Court to resolve is the primary coverage obligation for the damages arising from the July 30, 2013 motor vehicle accident. Home–Owners, which agrees that Onstott is not included in WTC's Allied business auto policy's definition of an "insured," argues that coverage under WTC's Allied business auto policy is nonetheless "indirectly" available to Onstott by virtue of (1) WTC's indemnification provisions, and (2) the "other insurance" and "insured contract" provisions in WTC's Allied business auto policy (Dkt 59 at 4). Home–Owners argues that the "other in-

surance" provision and the definition of "insured contract" encapsulate WTC's indemnity obligation (*id.* at 17). Home–Owners therefore submits that the ultimate priority of coverage is the Allied business auto policy's $1 million coverage followed by the AMCO excess policy's $10 million coverage (*id.* at 8).

Defendants Allied and AMCO argue that Home–Owners' auto and umbrella policies instead cover Onstott for defense and indemnification for all damages alleged against him in the *Bremer* and *Kleinheksel* lawsuits and that there do not appear to be any applicable exclusions (Dkt 61 at 15–19). Defendants argue that Home–Owners' auto and umbrella policies also cover WTC for defense and indemnification for all damages alleged against it in the *Kleinheksel* lawsuit (*id.* at 19–20). Defendants argue that the Allied and AMCO policies, in contrast, do not cover Onstott for defense or indemnification in either underlying case where Onstott is expressly not an "insured" under either policy (*id.* at 17–18, 20–22). Last, Defendants argue that the Allied policy covers WTC for defense and indemnification in the *Kleinheksel* lawsuit after the Home–Owners limits are exhausted, and that after the Home–Owners and Allied coverage are exhausted successively, "AMCO and Home–Owners will share tier two coverage 10/11ths and 1/11th respectively" (*id.* at 22–24).

As Home–Owners points out in Reply (Dkt 66 at 2, 6–7), Defendants did not address in their response Home–Owners' argument that the "other insurance" provision and the definition of "insured contract" encapsulate WTC's indemnity obligation to its officers and directors.

Home–Owners' argument for summary judgment in its favor has merit.

Again, Home–Owners agrees with Defendants Allied and AMCO that Onstott is not included in WTC's Allied business auto

policy's definition of an "insured." Home–Owners does not invoke coverage for Onstott under the Allied and AMCO policies. Rather, as counsel for Home–Owners emphasized at oral argument, "the coverage that Home–Owners seeks to tap is WTC's coverage." Home–Owners' auto policy provides that "[i]f [Home–Owners] make[s] a payment under this policy and the person to or for whom payment is made has a right to recover damages from another, we will be entitled to that right" (Pl.'s Ex. A, § V(3)(a), Dkt 59–2 at PageID.1072). Home–Owners seeks to tap the coverage that WTC purchased to cover its contractual obligation to indemnify.

In this regard, the relevant provisions of the business auto policy that WTC purchased from Allied provide the following:

B   General Conditions

\* \* \*

5   Other Insurance

a   For any covered auto you own this coverage form provides primary insurance. For any covered auto you don't own the insurance provided by this coverage form is excess over any other collectible insurance.

\* \* \*

c   *Regardless of the provisions of paragraph a. above this coverage form's Liability Coverage is primary for any liability assumed under an insured contract.*

(Pl.'s Ex. G, WTC's Allied business auto policy, Dkt 59–8 at PageID.1163) [emphasis added] ). "Insured contract," in turn, means "[t]hat part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for bodily injury or property damage to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement" (*id.* at PageID.1165).

Home–Owners also persuasively argues that the coverage afforded for the claims against Onstott under Allied business policy's "other insurance" and "insured contract" provisions, above, is "reinforced" by the complementary provision to the policy's contractual liability exclusion, which provides the following:

B   Exclusions

This insurance does not apply to any of the following

2   Contractual

Liability assumed under any contract or agreement

But this exclusion does not apply to liability for damages

a   Assumed in a contract or agreement that is an insured contract provided the bodily injury or property damage occurs subsequent to the execution of the contract or agreement or

b   That the insured would have in the absence of the contract or agreement.

(*id.* at PageID.1157). Home–Owners argues that, read together, these three provisions plainly render Allied's business auto coverage primary for the claims against Onstott when, as here, a WTC officer was operating his own vehicle on WTC business, and is therefore entitled to indemnification under the mandatory indemnification provisions of WTC's by-laws (Dkt 59 at 5, 9).

Last, Home–Owners points out that WTC's Allied business auto policy indicates that it is "primary for any liability assumed under an insured contract," and Home–Owners opines that it is settled principle that "when a right of indemnification exists, the indemnitor's coverage shall be deemed to be primary" (*id.* at 21–23).

Having reviewed the policy language, the Court determines that Home–Owners has discharged its burden under FED. R. CIV. P. 56. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir.1991) (opining that "for all purposes, the movant must always bear this initial burden regardless if an adverse party fails to respond"). Specifically, Home–Owners has demonstrated (1) that this declaratory judgment action was timely brought; (2) that WTC is contractually obligated to indemnify Onstott; and (3) that WTC's contractual obligation conforms to the definition of an "insured contract" in Allied's business auto policy, which expressly provides that the Allied business auto policy coverage is "primary for any liability assumed under an insured contract."

### III. CONCLUSION

Therefore, for the foregoing reasons:

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt 59) is GRANTED.

**IT IS FURTHER ORDERED** that Defendants' Cross–Motion for Summary Judgment (Dkt 61) is DENIED.

Because this Order resolves the last pending claim in this case, the Court will also enter a corresponding Judgment. *See* FED. R. CIV. P. 58.